STATE of Missouri, Respondent,

v.

Lance C. SHOCKLEY, Appellant.

No. SC 90286.

Supreme Court of Missouri,
En Banc.

Aug. 13, 2013.

Rehearing Denied Oct. 29, 2013.

180

Michael A. Gross, of Sher Corwin LLC, St. Louis, for Shockley.

Missouri Attorney General, Chris Koster and Daniel N. McPherson, Attorney General's Office, Jefferson City, for the State.

LAURA DENVIR STITH, Judge.

A jury convicted Lance Shockley of first-degree murder for the 2005 shooting death of Missouri highway patrolman, Sergeant Carl DeWayne Graham, Jr. The jury found the facts required by law to be established in order to impose a death sentence but was unable to agree whether to recommend a sentence of death or of life imprisonment. Pursuant to section 565.030.4, RSMo 2000 [1], the trial court conducted an independent review of the facts and imposed a death sentence. Mr. Shockley appeals. He argues that errors in the preparation of the trial transcript preclude adequate appellate review, that various evidentiary and instructional errors occurred, that the statute authorizing a trial judge to impose a sentence of death after the jury is unable to agree on punishment is unconstitutional, that a particular juror may have tainted jury deliberations, and that imposition of a death sentence is disproportionate to the strength of the evidence. For the reasons set forth below, this Court finds no reversible error in any of the points raised, finds that the sentence is proportionate to the crime and the defendant and affirms.

## I. STATEMENT OF FACTS

Considering the evidence in the light most favorable to the jury's verdict, *State v. Davis*, 318 S.W.3d 618 (Mo. banc 2010), on the evening of November 26, 2004, Mr. Shockley and his sister-in-law's fiance, Jeffrey Bayless, went for a drive in Mr. Bayless' truck. On their drive back home, Mr. Shockley lost control of the vehicle and crashed it into a ditch. Mr. Shockley got out of the truck and walked to the nearby home of Ivy and Paul Napier. He informed the couple that he had been in an accident and needed help. Ivy noticed blood on Mr. Shockley's hands and invited him inside. Mr. Napier accompanied Mr. Shockley to the accident scene and found Mr. Bayless injured beyond help. The two returned to the Napier residence where Mr. Shockley called his wife. Mr. Napier and Mr. Shockley then left and Ms. Napier called 911. She then set out for the crash site, where she spotted the truck off the side of the road and found Mr. Bayless inside. She checked him for a pulse and found none. In the meantime, Mr. Shockley joined Coree Shockley and her sister, Cindy Chilton, in their vehicle. During the drive, Mr. Shockley told Ms. Chilton that her fiancé Mr. Bayless was dead. The women then left Mr. Shockley at his house and joined Ms. Napier at the acci-

---

1. All statutory citations are to RSMo 2000.

dent scene. By the time they arrived, Mr. Napier had returned to the scene as well. When local police and highway patrol officers arrived at the scene, they discovered Mr. Bayless' body slumped over in the passenger seat of the vehicle. They also discovered beer cans and a tequila bottle inside the truck and a blood smear above the passenger-side wheel well on the outside of the truck. They instructed the three women and Mr. Napier to head home.

Highway patrol Sergeant Carl DeWayne Graham, Jr., headed the investigation of the accident. The night of the accident he spoke with Mr. Shockley at his home. Mr. Shockley did not admit to being involved in the accident. Before leaving, Sergeant Graham consoled Ms. Chilton and gave her his business card. She made no mention of Mr. Shockley's connection to the accident. Sergeant Graham then visited the Napiers. Although Mr. Shockley had previously confessed to Ms. Napier that he had been driving the truck, she said she did not know who was involved in the accident.

Four months later, Sergeant Graham visited Ms. Napier again, this time at her place of work. When he falsely told her that Mr. Shockley had admitted his involvement in the accident, Ms. Napier admitted to Sergeant Graham that Mr. Shockley had showed up at her house and asked for help after he wrecked the truck. Later that afternoon, Ms. Napier spoke with Mr. Shockley and learned that he actually had not confessed anything to Sergeant Graham about the accident.

Later that day, Ms. Chilton's mother informed her that Sergeant Graham wanted to speak with her about the accident. Mr. Shockley told Ms. Chilton that she did not have to talk to Sergeant Graham. Mr. Shockley then obtained Sergeant Graham's home address from Ms. Chilton's stepfa-ther, who was a friend of Sergeant Graham's landlord.

At approximately 12:20 p.m. the next day, March 20, 2005, Mr. Shockley borrowed his grandmother's red 1995 Pontiac Grand Am. The car had a bright yellow sticker on the driver's side of the trunk. Between about 1:45 p.m. and 4:15 p.m. that afternoon, various witnesses noticed a red Pontiac Grand Am—with a bright yellow sticker affixed to the driver's side of the trunk—parked on the wrong side of the road a few hundred feet from Sergeant Graham's residence. Mr. Shockley returned the Grand Am to his grandmother between 4:15 p.m. and 4:30 p.m. that same day. Investigators calculated that it took approximately 18 minutes to drive from Mr. Shockley's grandmother's house to the location where the red Grand Am with the yellow sticker had been parked near Sergeant Graham's house.

At 4:03 p.m. that day, Sergeant Graham had returned home, backed his patrol car into his driveway, and radioed dispatch that he was ending his shift. As Sergeant Graham exited his vehicle, he was shot from behind with a high-powered rifle that penetrated his Kevlar vest. The bullet severed his spinal cord at the neck, immediately paralyzing him. He fell backward and suffered fractures to his skull and ribs upon impact with the pavement. At this point, Sergeant Graham was still alive. The killer then approached Sergeant Graham and shot him twice more with a shotgun—into the face and shoulder. Sergeant Graham's body was discovered around 5:15 p.m. that day. The recovered rifle bullet was deformed, but ballistics experts determined that it belonged to the .22 to .24 caliber class of ammunition that would fit a .243 caliber rifle. Investigators later learned that around 7:00 p.m. on the evening of Sergeant Graham's murder, Ms. Shockley gave Mr. Shockley's uncle a box

of .243 caliber bullets and stated, "Lance said you'd know what to do with them."

That night, two Highway Patrol investigators went to the Shockley residence to interview Mr. Shockley. They were accompanied by S.W.A.T. members, who concealed themselves in the woods around the property. Before approaching the door, the investigators called Mr. Shockley on the telephone and informed him that they wanted to speak about the murder of Sergeant Graham. Mr. Shockley refused to talk, stating that he was a busy man and that they should visit him at work.

After the telephone call ended, the investigators saw Mr. Shockley walk out the front door of his house. They approached and identified themselves. Mr. Shockley immediately denied killing Sergeant Graham and stated that he had spent all day working around his house with his neighbor Sylvan Duncan. Mr. Shockley then told the investigators that the conversation was over and to get off of his property.

Shortly after the investigators departed but before all S.W.A.T. members had left, Mr. Shockley saw a S.W.A.T. member and yelled at him. When the members of S.W.A.T. started to leave, one S.W.A.T. member accidentally discharged his weapon while getting up off of the ground, injuring another S.W.A.T. member.

At about 11:30 a.m. the next day the two investigators with whom Mr. Shockley had spoken the night before approached him outside his workplace, where he was sitting in his car eating lunch with his cousin. Mr. Shockley told the officers he would speak with them when he finished eating. While the investigators waited by their car, Mr. Shockley called his wife on his cousin's cell phone and asked whether she had spoken with the police. She said that she had told the police that Mr. Shockley had been at home the day of the shooting until almost 5:45 p.m., when he went to his

uncle's for a few minutes. Mr. Shockley responded, "Okay, that will work, that will be fine."

Mr. Shockley then met with the investigators and elaborated on the alibi he had given them the night before, claiming that he had spent the previous day visiting relatives, including his grandmother, and that he watched from his living room as his neighbor, Sylvan Duncan, pushed brush. He also said he knew Sergeant Graham was investigating him for the fatal truck accident and, without prompting, declared that he did not know where Sergeant Graham lived. Mr. Shockley's parting words to the investigators were, "Don't come back to my house without a search warrant, because if you do there's going to be trouble and somebody is going to be shot."

Later that day, Mr. Shockley visited his grandmother and instructed her to tell the police that he had been home all day on the day Sergeant Graham was murdered. When his grandmother told Mr. Shockley she would not lie for him, he put his finger over her mouth and said, "I was home all day." He also told his cousin, who had overheard his lunch break telephone call with Mrs. Shockley, not to say anything about it.

Police arrested Mr. Shockley March 23, 2005, for leaving the scene of the November 26, 2004, car accident that resulted in Mr. Bayless' death. On March 29, the State charged Mr. Shockley with leaving the scene of a motor vehicle accident, armed criminal action and first-degree murder for the death of Sergeant Graham and sought the death penalty. The State proceeded to trial only on the first-degree murder charge. Its case theory was that Mr. Shockley killed the sergeant to stop the investigation into the death of Mr. Bayless. Mr. Shockley's defense was that it would have been ridiculous for him to

believe that simply by killing Sergeant Graham law enforcement would halt its investigation into the accident. The defense also argued that the police improperly directed all their investigative attention towards him rather than pursuing other leads into the death of Sergeant Graham.

After a five-day guilt phase proceeding, the jury found Mr. Shockley guilty of first-degree murder. The trial then proceeded to the penalty phase. The penalty phase instructions required the jury to answer three special interrogatories. The first required the jury to state whether it unanimously found beyond a reasonable doubt that at least one statutory aggravating circumstance existed. The State submitted four statutory aggravators: (1) that Sergeant Graham was a "peace officer" and the "murder was committed because of the exercise of his official duty," (2) that Mr. Shockley was depraved of mind when he killed Sergeant Graham and, "as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman", (3) that Sergeant Graham was murdered "for the purpose of avoiding ... or preventing a lawful arrest," and (4) that Sergeant Graham was a "potential witness in [a] past or pending investigation ... and was killed as a result of his status as a ... potential witness." § 565.032.2.

In the event that the jury failed to find unanimously and beyond a reasonable doubt the existence of one or more statutory aggravators, the instructions directed it to return a verdict of life imprisonment without parole. If the jury did, however, find one or more statutory aggravators beyond a reasonable doubt, the instructions required the jury then to determine whether there were circumstances in mitigation of punishment sufficient to outweigh the aggravating circumstances. If the jury unanimously found that mitigating circumstances outweighed the aggravating circumstances, the instructions directed it to return a verdict of life imprisonment without parole. But, if the jury found at least one statutory aggravator and failed to find unanimously that the mitigating circumstances outweighed the aggravating circumstances, then it was instructed to determine whether to impose a sentence of death or one of life imprisonment. § 565.030.4.

Here, the jury found the first, third and fourth statutory aggravators submitted by the State were proven beyond a reasonable doubt. It did not unanimously find that the circumstances in mitigation outweighed those in aggravation. As instructed, the jury then proceeded to the final question, whether to impose a sentence of death or life imprisonment, but the jury was unable to agree on which punishment to recommend.

Pursuant to section 565.030.4, where the jury is unable to agree on punishment, the trial court "shall assess and declare the punishment at life imprisonment ... or death." Before declaring a punishment, the trial court must follow the same procedure that the jury undertook: (1) the court must first determine whether one or more statutory aggravating circumstances were proven beyond a reasonable doubt, (2) if so, the court must weigh the mitigating and aggravating evidence to determine whether the circumstances in mitigation of punishment outweigh the circumstances in aggravation, and (3) if not, the court must then decide whether to impose a sentence of life imprisonment or death.

In accordance with this procedure, the trial court noted that the jury unanimously found Mr. Shockley guilty of first-degree murder beyond a reasonable doubt, that the jury unanimously agreed that three of the submitted statutory aggravators were present beyond a reasonable doubt, and that "the jury did not unanimously find

that there are facts and circumstances in mitigation of punishment sufficient to outweigh facts and circumstances in aggravation of punishment." Following an independent review of the evidence and the findings of the jury, the trial court agreed with the jury that the State had proved three statutory aggravating circumstances beyond a reasonable doubt; further, the trial court found that the mitigating circumstances did not outweigh those in aggravation. The court then determined the appropriate sentence to be death.

Mr. Shockley appeals his conviction and death sentence. Because Mr. Shockley received a death sentence, this Court has exclusive jurisdiction. Mo. Const. art. V, § 3.

## II. STANDARD OF REVIEW

■ This Court reviews the evidence in the light most favorable to the verdict. *Davis*, 318 S.W.3d 618; *see also State v. Strong*, 142 S.W.3d 702, 710 (Mo. banc 2004). Review of preserved issues:

> is for prejudice, not mere error, and the trial court's decision will be reversed only if the error was sufficiently prejudicial that it deprived the defendant of a fair trial. Any issue that was not preserved can only be reviewed for plain error, which requires a finding that manifest injustice or miscarriage of justice has resulted from the trial court error.

*State v. McLaughlin*, 265 S.W.3d 257, 262 (Mo. banc 2008) (citations omitted).

■ In cases where the death penalty has been imposed, section 565.035 also requires that this Court independently conduct a proportionality review "to prevent freakish and wanton application of the death penalty." *State v. Deck*, 303 S.W.3d 527, 550 (Mo. banc 2010).

## III. GUILT PHASE ERRORS

### A. Transcript Preparation

■ Mr. Shockley asserts that the trial transcript is so inaccurate and incomplete that appellate review would be based on a degree of conjecture and uncertainty that is impermissible in a death penalty case. The State contends that the transcript issues remaining in the record are minor, are not relevant to any of the issues raised on appeal and do not require remand for a new trial or cast doubt on the verdict.

■ An appellant is "entitled to a full and complete transcript" for appellate review. *State v. Middleton*, 995 S.W.2d 443, 466 (Mo. banc 1999). But, a record that is incomplete or inaccurate "does not automatically warrant reversal of the appellant's conviction." *Id.* The appellant is entitled to relief only if he or she "exercised due diligence to correct the deficiency in the record *and* he was prejudiced by the alleged defects." *Id.; see also State v. Christeson*, 50 S.W.3d 251, 271 (Mo. banc 2001). Here, Mr. Shockley has exercised due diligence in seeking to correct the record. Through diligence, Mr. Shockley successfully ensured that all relevant portions of the trial were included in the transcript on appeal. This Court finds that the prior difficulties in correcting the transcript and the remaining omission of a single inadvertently off-the-record conference do not impede this Court's review and are not prejudicial.

Court reporter Andrea Moore prepared the trial transcript using a voice recognition program that translated her spoken words into text and saved that text on her computer. She also used two microphones attached to digital recording devices, which created two separate audio recordings of the courtroom proceedings. Ms. Moore placed both of these devices in the main courtroom, where all of the testimony oc-

curred. After each day's testimony, Ms. Moore burned the text and audio recording data onto DVDs and made two copies of those DVDs. Upon the trial's completion, Ms. Moore planned to use the original and backup audio recordings to prepare an official typed transcript.

Problems arose when Ms. Moore developed bronchitis on the last day of the trial. No evidence was presented to support the defense's suggestion that the bronchitis may have affected her ability to record the proceedings or provide copies during trial. But the illness, as well as various unrelated family issues, did preclude her from completing the transcript after the trial's conclusion. She sent the audio and text files and written notes she made during trial to the Office of State Courts Administrator ("OSCA"). She worked with OSCA transcribers to clarify questions about her somewhat unusual recording and backup procedures. She helped transcribers to overcome equipment compatibility issues and to decipher particular portions of her recordings. She also helped transcribe a discussion that occurred before trial but after *voir dire* that had failed to record on her voice recorders but that OSCA had been able to recover from her backup audio files.

After Ms. Moore certified the transcript as accurate, it was filed with this Court May 3, 2010. In October 2010, Mr. Shockley filed a motion with this Court asking that the case be remanded to the circuit court for determination of the sufficiency of the trial transcript and for preparation of a supplemental transcript. His motion claimed that the transcript was unreliable due to the difficulties encountered by OSCA and that it was incomplete because it did not contain a proceeding that, Mr. Shockley asserted, Ms. Moore recorded but failed to include in the transcript concerning what the jury should do if it failed to agree on punishment. This Court remanded the case to the circuit court to determine whether the transcript was sufficient for appellate review.

On December 22, 2010, the circuit court conducted a hearing regarding the transcript. It concluded that two brief conferences between the judge and counsel held in the court anteroom during trial were not included in the transcript on appeal. Ms. Moore did record these proceedings; OSCA simply missed them in their initial transcription because they occurred outside the main courtroom. At the trial court's direction, OSCA prepared a supplemental transcript containing these discussions. Nothing said in either conference is the subject of any point raised on appeal.[2]

An attorney for Mr. Shockley testified at the hearing on remand that he also believed there to have been a record made in a smaller auxiliary courtroom during a meeting between trial counsel and the trial judge. He could not, however, say specifically what that record entailed, only that the discussion involved whether a different juror, Juror No. 58, should be stricken from the jury and whether Mr. Shockley's second attorney should continue with his representation. Ms. Moore testified that although she had set up recording equipment in the smaller auxiliary courtroom, the judge never instructed her to turn on the equipment.[3]

---

**2.** The first discussion concerned a question from the jury about what to do when it could not reach a verdict. Nothing about this question is at issue on appeal. The second discussion concerned a juror who had been seen smiling and winking at Mr. Shockley's family. The State did not ask that the juror be re- moved and the Court concluded that there was insufficient evidence to establish that the juror engaged in any misconduct.

**3.** The State also indicated this issue was discussed off-the-record in chambers. Those discussions are not at issue on appeal.

One of the two prosecutors testified that although the failure to turn on recording equipment meant that discussions regarding Juror 58 that occurred in the auxiliary courtroom were not recorded, all of the parties thereafter went into the main courtroom to make a record regarding counsels' positions and what the court intended to do. The prosecutor said this subsequent discussion captured what had occurred during the unrecorded conference. Defense counsel agreed that the subsequent discussion in the main courtroom—which was recorded—included both parties' positions on the issue and the court's ruling.

Mr. Shockley does not claim on appeal that any issue raised in the auxiliary courtroom was not then discussed on-the-record in the main courtroom. Similarly, while he notes that various portions of the remainder of the transcript have inaudible words, he does not identify any such instance that has affected his ability to brief or support issues raised on appeal. He nonetheless asks this Court to remand for a new trial, asserting that the shortcomings in the original transcript and the failure of Ms. Moore to record the auxiliary courtroom conversation demonstrate that there *may* have been other as yet unidentified errors or omissions in the transcript that have not been corrected. These potential shortcomings, Mr. Shockley argues, make "reliance on the transcript by this Court ... fraught with danger" and should so undermine this Court's confidence in the sufficiency of the record for appellate review that a new trial is warranted.

This Court will not engage in speculation. The court reporter worked with OSCA to prepare the transcript, and OSCA prepared a supplemental transcript of the anteroom conversations excluded from the original transcript. The subject of the single unrecorded auxiliary court-room bench conference was repeated on the record in the main courtroom. While Mr. Shockley asks this Court to presume that there must be more errors beyond those already identified and corrected, he points this Court to no specific material omission. In these circumstances, Mr. Shockley simply has failed to meet his burden of showing that defects in the transcript caused him undue prejudice.

**B. Comment on the Defendant's Failure to Testify**

■ Mr. Shockley argues that a comment made by the prosecutor improperly referred to Mr. Shockley's failure to testify. Mr. Shockley concedes that he did not raise an objection following the prosecutor's statement and that the judge *sua sponte* told the prosecutor to "keep your comments to yourself." Nonetheless, he says, the prejudice was so serious that the trial court committed plain error in not *sua sponte* declaring a mistrial because of the comment. The State argues that the comment was not on Mr. Shockley's failure to testify at all and that, even had the comment indirectly alluded to his silence, it was not so prejudicial as to constitute plain error requiring a mistrial.

The comment at issue occurred during the cross-examination of Lisa Hart. She testified on direct examination that on the day of the murder she and her husband met with a realtor to look at a home near where Sergeant Graham lived. She said she noticed a red Grand Am with a softball-sized yellow sticker parked near Sergeant Graham's home when they arrived and that the vehicle was still there when they left. She remembered the car because it was facing the wrong direction and because of the bright yellow sticker. After learning of the murder, she informed local police about the car and they asked her to come by the station for further discussion. Without any advanced notice

to the officers at the station, Ms. Hart dropped by the station with her husband a few hours after the request. She explained on cross-examination that as she approached the station she saw a police officer backing a red Grand Am out of the police garage. She immediately turned to her husband and stated, "Oh my gosh. That's it." She and defense counsel had the following exchange at trial:

Q. Do you know [Mr. Shockley's grandmother]?

A. No.

Q. Do you know why her car would be across from where Sergeant Graham was murdered—

A. No.

Q.—on March 20, 2005?

A. No.

[PROSECUTOR] BELLAMY: Someone does.

THE COURT: Keep the comments to yourself. I've already warned defense counsel.

(emphasis added).

Defense counsel did not object to the prosecutor's comment, ask that the jury be instructed to disregard it or ask for a mistrial. Mr. Shockley now asks that this Court remand for a new trial because, he argues, the trial court committed plain error in not *sua sponte* granting a mistrial based on his claim that the words "someone does" constituted a direct comment on his failure to testify.[4]

■ The State is not permitted to comment, directly or indirectly, about a defendant's failure to testify. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). "A direct reference to an accused's

failure to testify is made when the prosecutor uses words such as 'defendant,' 'accused' and 'testify' or their equivalent." *State v. Neff*, 978 S.W.2d 341, 344 (Mo. banc 1998); *see also State v. Lawhorn*, 762 S.W.2d 820, 826 (Mo. banc 1988). The State's comment "someone does" is not a direct comment on Mr. Shockley's failure to testify. The State did not use words such as "defendant" or "accused" to indicate that it was referring to Mr. Shockley, nor did it insinuate that it was referring to Mr. Shockley's lack of testimony. It is patently evident that someone had to know why the car was parked where it was. That person could have been the driver, a passerby who saw the car being parked or driven away, or someone who lived in the area; it need not have been Mr. Shockley. The comment "someone does" was not a direct comment on Mr. Shockley's failure to testify.

■ Mr. Shockley argues that if the Court finds that the prosecutor's statement is not a direct comment on his failure to testify, at least it must constitute an indirect comment. An indirect comment is one that does not overtly mention testifying in connection with the defendant but nonetheless is "reasonably apt to direct the jury's attention to the defendant's failure to testify." *Neff*, 978 S.W.2d at 344.

■ Ultimately, this Court need not determine whether the comment was an indirect one on defendant's failure to testify or was simply an ill-advised and inappropriate remark upon the fact that "someone" could explain the presence of the vehicle near Sergeant Graham's house. Assuming, without deciding, that the com-

---

4. When a defendant fails to make an objection contemporaneous with the purported error, on appellate review, the issue is evaluated for plain error, which requires a showing that the error resulted in manifest injustice or a miscarriage of justice. *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009).

ment was an indirect one,[5] even when objected to "an indirect reference requires reversal only if there is a calculated intent to magnify that decision [not to testify] so as to call it to the jury's attention." *Id.* The facts do not demonstrate any such calculated attempt by the State to cross the prohibited line. The comment was an isolated, off-the-cuff statement, "not obviously intended to poison the minds of the jurors against the defendant." *Id.* at 347. Any prejudice certainly could have been cured by an instruction to the jury had an objection been made and an instruction been requested. *See, e.g., Neff,* 978 S.W.2d at 345 ("If the prejudice were not immediately correctable short of mistrial, the requirement of a timely objection would be illogical"); *State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992)(prejudice curable by instruction); *accord State v. Dees,* 916 S.W.2d 287, 296 (Mo.App.1995). Sua sponte declaration of a mistrial was not required. An alleged comment on the failure to testify, like other unpreserved errors, provides a basis for reversal only when the defendant goes beyond a showing of demonstrable prejudice to establish manifest prejudice affecting substantial rights. *State v. Parker,* 856 S.W.2d 331, 332 (Mo. banc 1993). This "drastic remedy" will be exercised only in those "ex-

traordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *State v. Ward,* 242 S.W.3d 698, 704 (Mo. banc 2008). This is normally the case only upon a showing by the defendant that the improper comment had a decisive effect on the jury's verdict. *Id.* at 705.

Mr. Shockley has fallen far short of showing that this comment had a decisive effect on the jury. By the time the prosecutor uttered the remark, the jury's attention already was directed to the mystery surrounding who parked the car on Sergeant Graham's street and whether it was the grandmother's car, as that was a central issue in the case. Both counsel inquired of Ms. Hart and other witnesses whether they saw who drove the car parked outside Sergeant Graham's home, where the grandmother's car was at the time of the murder, whether Mr. Shockley asked his grandmother if he could borrow the car, what time Mr. Shockley returned the car to his grandmother and whether Mr. Shockley explained why he was borrowing his grandmother's car. The jury by then was contemplating whether the car parked outside Sergeant Graham's home belonged to Mr. Shockley's grandmother, why the car was there and who drove the car. The single statement of the

---

**5.** This Court has on numerous occasions evaluated whether comments by the State constituted indirect references to a defendant's failure to testify. *See, e.g., State v. Williams,* 673 S.W.2d 32, 36 (Mo. banc 1984), in which this Court held that the following remarks by a prosecutor *would* reasonably be construed as reference to defendant's failure to testify: "[T]here is no eyewitness as to what happened in that bathroom that the State can produce for you today. There's only two people back there that knows exactly what happened and can tell you—who knows exactly what happened back there." In *State v. Rothaus,* 530 S.W.2d 235 (Mo. banc 1975), this Court held that the following remarks by a prosecutor *would not* reasonably be construed

as reference to defendant's failure to testify: "How does the defendant know that [the prescription is] false, forged and counterfeit? You arrive at that decision by circumstances, by looking at the surrounding facts. The only one who can actually say he knows is the defendant."

In a fact situation most comparable to that before the Court today, *State v. Clemons,* 946 S.W.2d 206, 228 (Mo. banc 1997), holds that multiple comments by a prosecutor that the evidence against appellant was undisputed or uncontradicted were *not* an indirect reference to a defendant's failure to testify because the case did not present a situation where only the defendant could dispute the state's evidence.

obvious, that someone had to know why it was there, a statement that could refer to many people in addition to defendant, did not add to this focus. Moreover, the judge immediately told counsel to keep his comments to himself, and the comment was not repeated or emphasized.

Finally, the trial court, at the request of the defense, submitted MAI–CR 3d 308.14 to the jury. It instructed the jury that Mr. Shockley had the right not to testify and that the jury could not draw an adverse inference from Mr. Shockley's failure to testify. As noted in *Dees,* 916 S.W.2d at 297, the giving of this instruction can help ameliorate any prejudice that otherwise might result from a single comment on the failure to testify.

In these circumstances, the comment could not have been manifestly unjust or caused a miscarriage of justice. The trial court did not commit plain error in failing to grant a mistrial *sua sponte.*

### C. Character Evidence

■ Mr. Shockley argues that the trial court erred in not sustaining his request for a mistrial after a highway patrol officer, Sergeant Jeff Heath, testified that S.W.A.T. accompanied him to interview Mr. Shockley due to Mr. Shockley's history of violence. Mr. Shockley's complaint on appeal is not with the mention of S.W.A.T., nor is it with the actual presence of S.W.A.T. members at the interview; counsel used these same facts to support the defense theory that the police wrongly and prematurely targeted Mr. Shockley. Rather, Mr. Shockley asserts that the trial court should have granted his motion for mistrial because the prosecutor's reference to his "violent history" constituted impermissible propensity evidence. The State denies that the issue was preserved or that the remark constituted propensity evidence and argues the reference was made only to explain the large police presence, in response to defense counsel's theory that the police unfairly targeted Mr. Shockley.

The challenged comment regarding Mr. Shockley's history of violence occurred during the State's direct examination of Sergeant Heath. The interaction between counsel, Sergeant Heath, and the court was as follows:

Q. Now, when you became involved in this investigation it was the evening or night that Sergeant Graham was murdered?

A. Yes, sir. March 20, 2005.

Q. And sometime that evening it was decided that you and another officer should go out and interview [Lance Shockley], correct?

A. Yes, sir.

. . . .

Q. It was late at night?

A. Yes.

Q. It was dark?

A. Yes, sir.

. . . .

Q. Before going out there were you made aware that your superiors wanted some additional people to go along as— I'll use the term "backup"?

A. Yes, sir.

Q. And who was that that was going to go out there and what role were they supposed to play?

A. It was the Sikeston Department of Public Safety's SWAT team, if you will.

Q. *And why were they going out with you?*

A. *A decision was made by my bosses, if you will, that due to Lance Shockley's violent history, that—*

MR. KESSLER: Your honor, I object.

THE WITNESS:—police should—

MR. KESSLER: Excuse me, sir.

THE WITNESS:—the SWAT team should go with me.

THE COURT: Hold on.

MR. KESSLER: Excuse me, sir.

THE COURT: You wanted to approach?

MR. KESSLER: Yes.

(At this time counsel approached the bench, and the following proceedings were had)

*MR. KESSLER: I object to any introduction of his history. This goes to character. It's only offered for that purpose, period. I object.*

*MR. ZOELLNER:* **Judge, I'm not going into his violent history. It goes to explain why they're out there. They've been beating on these people and they had to open this door as why they went out there and why it happened. It goes to explain this.**

*MR. KESSLER: Judge, it doesn't—*

*MR. ZOELLNER: And I wasn't going into his history.*

*THE COURT: All right. Hold on. I'm going to sustain the objection. Are you requesting the instruction from the Court?*

*MR. KESSLER: Yes, Judge.* **As I understand it the objection has been sustained as this goes to character and that it's not been introduced because our client hasn't testified and introduced his character. That was our whole objection**

*THE COURT: And what do you wish me to instruct the jury?*

*MR. KESSLER: I ask that the jury be instructed to disregard that statement....*

THE COURT: I'll sustain that. I intend on so instructing.

. . .

*MR. KESSLER:* **All right, Judge, we'd ask for a mistrial.** I believe that was a statement that was asked for and responded to that apparently Mr. Zoellner knew he was going to ask the question and knew why he was going to introduce it. Those purposes were improper. Now it's put something to the jury they had no information about. This is the first time and it's the last witness. It's been done solely to prejudice my client in the eyes of the jury. There w[ere] no questions ever about—you know put from us to anybody about why there were out there. It was because he was safe or it was a decision at highway patrol to send these people out there. What ended up happening has been the subject, not necessarily cross-examination.

It was introduced by the State as early as their opening statement, and every chance they've had to talk about it, they've characterized it as a silly little incident, that it was an accident, that it was something that just happened. They introduced it into the case, not us. We ask for a mistrial, Judge, because I don't believe there's any way to cure the prejudice that's occurred.

THE COURT: *All right. That request is overruled and denied.*

(Proceeding returned to open court.)

THE COURT: *The jury is instructed to disregard any comment made by the witness regarding any character or reputation of the defendant and it should not be considered as evidence in this case.*

(emphasis added).

Defense counsel did not object to Sergeant Heath's reference to Mr. Shockley's "violent history" on the ground now raised on appeal-that it constituted improper propensity evidence. To the contrary, defense counsel specifically stated that this

statement "goes to character and that it's not been introduced because our client hasn't testified and introduced his character. ***That was our whole objection.***" Defense counsel thereby made clear that his "whole objection" was that the comment on his client's violent history was an attempt to impugn his client's character. The trial court agreed, sustaining the objection and instructing the jury to disregard the comment. The only requested relief not granted was the request for a mistrial.

On appeal, however, Mr. Shockley does not argue that the trial court erred in not granting a mistrial because the comment constituted improper character evidence nor does he cite cases holding that a single comment on a defendant's violent character requires a mistrial. Instead he argues that the evidence was improper propensity evidence. "On appeal, a defendant may not broaden the objection presented to the circuit court." *State v. Tisius*, 362 S.W.3d 398, 405 (Mo. banc 2012). Recognizing that he only objected below to the comment as character evidence, he attempts to merge the character and propensity evidence concepts. Mr. Shockley argues that evidence of his violent character also can be considered to be evidence that he has a propensity for violence and, therefore, his character evidence objection should in parallel fashion be considered as if he had objected to the comment as improper propensity evidence. This argument is meritless. Character and propensity evidence are distinct from one another.

Propensity evidence is "evidence of uncharged crimes, wrongs, or acts" used to establish that defendant has a natural tendency to commit the crime charged. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). It is evidence of specific and distinct prior acts. "The well-established general rule is that proof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954).[6]

By contrast, character evidence does not involve proof of specific prior instances of conduct, but constitutes evidence that concerns a person's reputation, such as whether someone in the defendant's community views the defendant as a law-abiding citizen, a peaceable person, a truthful person, or as having any other general character trait. *Haynam v. Laclede Elec. Co-op., Inc.*, 827 S.W.2d 200, 205–06 (Mo. banc 1992). Here, the comment was not a specific instance of conduct, but concerned general character. Accordingly, defense counsel objected that because he had not attempted to show that Mr. Shockley had a good character, the State could not introduce evidence of his bad character. Defense counsel is correct that (while there are a variety of reasons why character evidence is admissible) if the purpose of the evidence is "to prove

---

6. Although propensity evidence generally is inadmissible due to its potential to cause undue prejudice, there are numerous well-settled exceptions to the general rule. *Bernard*, 849 S.W.2d at 13 states that propensity evidence is admissible if it is relevant to establish "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial.' " *But see State v. Vorhees*, 248 S.W.3d 585 (Mo. banc 2008)(signature *modus operandi* corroboration exception cannot be used to admit propensity evidence).

the defendant is the kind of person who would commit the crime" charged, the state can introduce it only if the defendant first puts his or her character in issue. *Haynam*, 827 S.W.2d at 205.

In any event, it is evident from the transcript that the prosecution witness did not mention Mr. Shockley's violent history in order to prove that Mr. Shockley had acted in conformity with that character for violence in killing the victim. He made the statement to explain why *the police* acted as they did. As the State notes, it was entitled to show why the police brought extensive backup because defendant had opened the door to such testimony. Otherwise inadmissible evidence "can nevertheless become admissible because a party has opened the door to it with a theory presented in an opening statement," *State v. Rutter*, 93 S.W.3d 714, 727 (Mo. banc 2002), or through cross-examination. *State v. Watson*, 391 S.W.3d 18, 23 (Mo.App.2012). Where "the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar*, 726 S.W.2d 728, 734–35 (Mo. banc 1987). Similarly, otherwise inadmissible evidence can become admissible if its purpose is to explain subsequent police conduct. *See State v. Edwards*, 116 S.W.3d 511, 533 (Mo. banc 2003); *accord State v. Dunn*, 817 S.W.2d 241, 243 (Mo. banc 1991).

In its opening statement, defense counsel argued that members of the Missouri highway patrol targeted Lance Shockley to the exclusion of other possible perpetrators. Counsel continued to press the targeted investigation theme during cross-examination of several State's witnesses, asking questions such as: "He was the suspect to the exclusion of everybody else,

right?," "Were anybody—Any of these leads, anybody else's house surrounded by 10, 20 officers from around the state?", and "Are you aware of anybody else that was standing in his own front yard when someone accidentally, a sniper, a trained sniper accidentally discharged his firearm? ... Only happened to Lance Shockley, didn't it?"

Sergeant Heath was the State's last witness. The State did not focus on Mr. Shockley's violent history or go into detail about it. It simply allowed the witness to explain why the police brought so many officers when they wished to question Mr. Shockley. Moreover, evidence of Mr. Shockley's violent character otherwise was properly before the jury through evidence that he told the investigators who came to question him at his work, "Don't come back to my house without a search warrant, because if you do there's going to be trouble and somebody is going to be shot." No manifest injustice occurred as a result of the witness' single reference to his violent history to explain why the police brought so many officers to Mr. Shockley's property when they questioned him.

### D. Cumulative Non–Error Does Not Constitute Error

Mr. Shockley alternatively argues in his next point relied on that even if the "violent history" comment considered by itself did not cause manifest injustice, three other actions or comments made during trial worked collectively with it to "impugn Mr. Shockley's character and to make jurors more prone to find him guilty of the offenses charged in this case because of a supposed propensity to engage in criminal behavior."

The claimed additional actions and comments include the prosecutor's split-second projection during trial of a photograph that displayed Mr. Shockley in an orange

prison jumpsuit; a gratuitous comment by a highway patrol officer who stated that it was Mr. Shockley who shot Sergeant Graham and that the shooting was deliberate; and a comment by the prosecutor in closing argument that, Mr. Shockley alleges, demonstrated Mr. Shockley's propensity to kill and was evidence of bad acts and bad character. Mr. Shockley does not claim on appeal that any of these occurrences in themselves caused prejudicial error, no doubt because as to each he either did not object or was granted all the relief that he requested during trial. He does argue that they had the cumulative negative effect of highlighting his violent nature, however.

 A key difficulty with this argument is that defense counsel never argued to the trial court that Mr. Shockley was entitled to a mistrial due to the cumulative effect of the "violent history" comment when considered in conjunction with these other actions or comments. The trial court has broad discretion to exclude or admit evidence at trial. This Court will reverse only upon a showing of a clear abuse of discretion. *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998). This Court does not find that the trial court abused its discretion in denying a motion for mistrial on a basis that was not raised. *See State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997).

This failure to request a mistrial based on the alleged cumulative effect of these occurrences may be why, although Mr. Shockley's argument discusses whether a *mistrial* would have been appropriate and cites to the law regarding mistrials, his point relied on says without citation that the error was in not granting a *new trial*. Even were this disconsonance between the point relied on and the argument overlooked, however, the trial court did not err

in overruling Mr. Shockley's motion for new trial.

 "The purpose of a motion for new trial 'is to allow the trial court the opportunity to reflect on its action during the trial.'" *State v. Bartlik*, 363 S.W.3d 388, 391 (Mo.App.2012) (citations omitted). "Raising an issue for the first time in a motion for new trial, when an objection could have been made at trial, is insufficient to preserve the claimed error for appellate review." *State v. Goeman*, 386 S.W.3d 873, 881 (Mo.App.2012). As he failed to claim a cumulative effect of these occurrences at trial, he therefore could not have preserved the cumulative error point he now asserts even had he properly raised it in his motion for new trial. But, he did not try to do so.

The only two comments that the motion for new trial claimed had a cumulative negative effect were the combination of the comment that Mr. Shockley had a violent history with the highway patrol officer's comment that he believed Mr. Shockley had shot the victim deliberately. The other two occurrences therefore are not further considered. Even as to the highway patrolman's comment, counsel failed to explain in his motion for new trial how the patrolman's comment, that he believed Mr. Shockley deliberately shot the victim, cumulatively could have caused manifest injustice where, as here, Mr. Shockley was on trial for first-degree murder for shooting the victim deliberately. All of the state's evidence was focused on proving that he did so. The highway patrolman's gratuitous comment did not affect that focus. This may be why in his motion for new trial Mr. Shockley argues only that the patrolman's comment was "non-responsive," which would not in itself be unduly prejudicial or necessarily act cumulatively with a comment about his character. This is especially true when one con-

siders that at trial not only did counsel choose not to object to the comment, but he actually used it to his advantage by showing it supported his theory that the police were biased against Mr. Shockley and did not conduct a fair investigation.[7] As explained in *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009), plain error review is waived when "counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence." This Court's review of the record shows no error in failing to grant a new trial due to the alleged prejudicial cumulative effect of this evidence.

## IV. PENALTY PHASE ERRORS

### A. Instructing on Mitigating and Aggravating Circumstances

■ Mr. Shockley argues that Instruction 14 was improper because it failed to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances equaled or outweighed the mitigating circumstances.[8] This argument is unpersuasive. Section 565.030.4(3) directs the jury to weigh the mitigating circumstances to see if they outweigh those in aggravation. *Id.* If the jury unanimously so determines, then the jury is directed to return a verdict of life imprisonment. *Id.* The section

7. The exchange with defense counsel was as follows:

> Q: And so you can't tell the jury that that happened before you all went out there to search?
> A: I know there was an accidental discharge. That's all I know for sure.
> Q: All right. And that was an accidental discharge by someone other than Mr. Shockley, correct?
> A: Yes. I don't believe his shots were accidental.
> Q: It was—And now, let's examine that ignorant statement, can we? All right. The question to you, sir, as I understand, was you can't say that Mr. Shockley fired any shot that night and that it was fired by law enforcement officer. Your response was that, "I don't believe his shots were accidental," thus suggesting that he shot Sergeant Graham, right?
> A: Yes, sir.
> Q: That's your bias, correct?
> A: That's the results of the investigation, sir.
> Q: Your investigation, correct?
> A: It was a combination of many people's investigation.
> Q: All right. And yet, we haven't heard any results. We haven't heard one piece of DNA evidence that ties Lance Shockley to the scene, have we?
> A: No, sir.
> Q: We haven't heard one identification from anybody there that says he was at the scene, have we?
> A: No sir.

8. Instruction 14 stated:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 13 exists, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment.
>
> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial, including evidence presented in support of the statutory aggravating circumstances submitted in Instruction No. 13, and evidence presented in support of mitigating circumstances submitted in this instruction.
>
> You shall also consider any facts or circumstances which you find from the evidence in mitigation of punishment.
>
> It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the facts or circumstances in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

does not impose on the State the burden of proving beyond a reasonable doubt that the aggravating circumstances outweigh those in mitigation. This Court has on numerous prior occasions rejected arguments similar to Mr. Shockley's.[9]

Here, the jury's verdict form shows that the jury followed the required statutory procedure in unanimously finding three statutory aggravating circumstances and in failing to find unanimously that the mitigating circumstances outweighed those in aggravation. Mr. Shockley cites no other authority to support his argument that the constitution or Missouri statutes require otherwise.

### B. The Jury was Instructed Properly on What Would Happen if it Could Not Agree on Punishment

Section 565.030.4 sets out the procedure the jury must follow in returning a penalty phase verdict in a death penalty case. It states:

> If the trier assesses and declares the punishment at death it shall, in its findings or verdict, set out in writing the aggravating circumstance or circumstances listed in subsection 2 of section 565.032 which it found beyond a reasonable doubt. *If the trier is a jury it shall be instructed before the case is submitted that if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor or death.* The court shall follow the same procedure as set out in this section whenever it is required to determine punishment for murder in the first degree.

§ 565.030.4(4)(emphasis added). Instruction 16 instructed the jury in accordance with this statute.[10] Mr. Shockley asserts that the emphasized portion of the statute, repeated in Instruction 16, unconstitutionally reduces jury responsibility for reaching a verdict by depriving him of his constitutional right to have a jury determine his sentence. In support, he cites *Cald-*

---

9. *See State v. Anderson*, 306 S.W.3d 529, 539–40 (Mo. banc 2010); *State v. Johnson*, 284 S.W.3d 561, 587–89 (Mo. banc 2009); *State v. Taylor*, 134 S.W.3d 21, 30 (Mo. banc 2004). *See also Kansas v. Marsh*, 548 U.S. 163, 169–80, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006)(upholding the constitutionality of a Kansas death penalty statute that placed the burden on the State to prove beyond a reasonable doubt that mitigators do not outweigh aggravators, noting the constitutionality of an Arizona statute that places the burden on the defendant to prove that mitigators outweigh the aggravators and stating "that a State enjoys a range of discretion in ... the manner in which aggravating and mitigating circumstances are to be weighed.").

10. Instruction 16 stated in pertinent part:

....

If you do unanimously find at least one statutory aggravating circumstance beyond a reasonable doubt, as submitted in Instruction No. 13, and you are unable to unanimously find that the facts or circumstances in mitigation of punishment outweigh the facts and circumstance in aggravation of punishment, but are unable to agree upon the punishment, your foreperson will complete the verdict form and sign the verdict form stating that you are unable to decide or agree upon the punishment. In such case, you must answer the questions on the verdict form and write into your verdict all of the statutory aggravating circumstances submitted in Instruction No. 13 that you found beyond a reasonable doubt and your foreperson must sign the verdict form stating that you are unable to decide or agree upon the punishment. If you return a verdict indicating that you are unable to decide or agree upon the punishment, the court will fix the defendant's punishment at death or at imprisonment for life by the Department of Corrections without eligibility for probation or parole. You will bear in mind, however, that under the law, it is the primary duty and responsibility of the jury to fix the punishment.

*well v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

*Caldwell* does not support this argument. In *Caldwell*, the prosecutor informed the jury that even if it fixed the defendant's sentence at death, the sentence would be subject to appellate review. *Id.* at 325–26, 105 S.Ct. 2633. The Court found that the prosecutor's suggestion could have led the jurors to believe that the ultimate determination of death rested not with them, but with an appellate court, thereby minimizing the importance of the jury's role. *Id.* at 330–34. *Caldwell* warned that "the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." *Id.* at 333.

Section 565.030.4 does not require the jury be told that its decision to assess a sentence of death is subject to appellate review, as occurred in *Caldwell.* Instead, the law requires that the court instruct the jurors that the court will assess the punishment itself at either death or life imprisonment *only if* the jury is *unable* to agree on punishment after it unanimously determines that one or more statutory aggravators have been proved beyond a reasonable doubt and the jury fails to unanimously find that the factors in mitigation outweigh those in aggravation. Mr. Shockley offers no authority holding that the requirements of section 565.030 improperly diminish the jury's sense of responsibility for determining the appropriateness of a death sentence, and this Court finds no reason to do so. Accordingly, this Court rejects Mr. Shockley's claim that section 565.030 deprives him of his constitutional right to jury sentencing.

### C. Section 565.030.4 Does Not Require Improper Judge Factfinding

█ Mr. Shockley argues that section 565.030.4 is unconstitutional because it im-

permissibly permits the judge, rather than the jury, to weigh the aggravators and mitigators and determine punishment if the jury is unable to reach a verdict. He misreads the statute. Section 565.030.4 and the other statutory provisions governing death penalty cases require the jury to find a statutory aggravator beyond a reasonable doubt, to consider other aggravating and mitigating circumstances and to determine whether the factors in mitigation outweigh those in aggravation. §§ 565.032.1, 565.030.4. If the jury finds that the mitigators outweigh the aggravators, it must impose a life sentence. § 565.030.4(3). Only if it does not so find do the statutes direct the jury then to consider whether a death or life sentence is appropriate. It is solely when the jury is unable to agree on this final step that the statutes allow the jury to return a verdict stating that it is unable to agree on punishment. *Id.*

Here, the jurors answered special interrogatories listing three statutory aggravators that they found unanimously beyond a reasonable doubt. They answered that they did not find unanimously that the mitigating circumstances outweighed those in aggravation. The special interrogatories showed that the jury deadlocked only on the issue of whether to assess a penalty of death or of life imprisonment.

Permitting a judge to consider the presence of statutory aggravators and to weigh mitigating evidence against that in aggravation in deciding whether to impose a death sentence when the jury did not unanimously agree on punishment does not negate the fact that the jury already had made the required findings that the State proved one or more statutory aggravators beyond a reasonable doubt and that it did not unanimously find that the factors in mitigation outweighed those in aggravation. Rather, the statute provides

an extra layer of findings that must occur before the court may impose a death sentence. Mr. Shockley's argument is without merit.[11]

### D. Alleged Improper Juror Influence

■ Mr. Shockley argues that he suffered prejudice because Juror 58 may have improperly influenced other jurors. Juror 58 served as the foreman during the guilt phase of Mr. Shockley's trial but the court removed him just prior to the penalty phase deliberations after counsel for Mr. Shockley objected to his continued involvement in the trial due to the content of a novel previously written by the juror. The novel, a fictional autobiography, chronicled the protagonist's brutal and graphic revenge murder of a teenager who killed the protagonist's wife in a drunken driving accident and who the protagonist viewed as escaping justice in the court system because he received only probation following his involuntary manslaughter conviction. When defense counsel learned of the contents of the novel just prior to penalty phase deliberations, he asked the trial court to question Juror 58 on the record as to the contents of the book and the juror's personal beliefs as well as to inquire of all the jurors as to any effect that Juror 58's personal beliefs and opinions had on jury deliberations. The court denied the request to question Juror 58 at that time because it found no evidence of juror misconduct and believed any questioning of Juror 58 at that point might improperly taint the whole jury. Mr. Shockley then moved for a mistrial. The trial court overruled the motion but did advise Mr. Shockley that following the trial he could inquire of the jurors if necessary. After additional arguments, the court dismissed Juror 58 by consent of both parties, replacing him with an alternate juror for the penalty phase deliberations. The alternate juror listened to the penalty phase closing argument and participated in the penalty phase deliberations. No error is claimed in this substitution.

Mr. Shockley asserts that the trial court should have granted his motion for mistrial or subsequent motion for new trial because the content of Juror 58's novel is so close to the facts of Mr. Shockley's case and reveals such an inherent bias that it must mean that Juror 58 lied during *voir dire* when he stated that he could be fair and impartial. Mr. Shockley claims Juror 58's experiences and beliefs, as illuminated in his writing, had likely been influential upon the other jurors.

While these types of allegations most often are made when asserting intentional nondisclosure by a juror during *voir dire*, Mr. Shockley has neither cited cases setting out the standard for granting a new trial for intentional non-disclosure nor at-

---

**11.** As this Court held in *State v. McLaughlin*, 265 S.W.3d 257 (Mo. banc 2008), *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003):

... does not state that a judge cannot enter a death sentence if the jury deadlocks; it says, rather, that under the principles set out in *Ring* [*v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)], the jury must make the required factual findings that increase the punishment from a life sentence to death. *Whitfield*, 107 S.W.3d at 261–62.

Since *Whitfield*, Missouri's instructions in capital cases have been revised to require the jurors to answer special interrogatories indicating whether they found a statutory aggravating factor to be present, and if so, what factor, and whether they found that mitigating evidence did not outweigh aggravating evidence. *See* MAI CR 3d 314.40, 314.58.... *Whitfield* did not hold that a judge could not consider the facts and make a determination whether to impose death once a jury had found the facts necessary to make a defendant eligible for a death sentence under section 565.030.4, and such a procedure does not violate *Ring*.
*McLaughlin*, 265 S.W.3d at 264.

tempted to show how these cases would apply to Juror 58. This may be because intentional nondisclosure in *voir dire* occurs only if the venireperson falsely answers a "question asked of the prospective juror." *Williams By and Through Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987). Here, neither counsel asked Juror 58 any questions about his novel during *voir dire*, even after he volunteered that he was a published author and said he did so because "I thought that series of questions to ask about that should come out front as well." Juror 58 cannot have lied in response to a question not asked. *See State v. Brown*, 939 S.W.2d 882, 884 (Mo. banc 1997).

Instead, Mr. Shockley claims a violation of section 547.020 in the argument section of his brief (although he does not mention it in his point relied on). That statute addresses the trial court's right to grant new trials generally. It states:

The court may grant a new trial for the following causes, or any of them:

(1) When the jury has received any evidence, papers or documents, not authorized by the court, or the court has admitted illegal testimony, or excluded competent and legal testimony, or for newly discovered evidence;

(2) When the jury has been separated without leave of the court, after retiring to deliberate upon their verdict, or has been guilty of any misconduct tending to prevent a fair and due consideration of the case;

(3) When the verdict has been decided by means other than a fair expression of opinion on the part of all the jurors;

(4) When the court has misdirected the jury in a material matter of law;

(5) When the verdict is contrary to the law or evidence.

Here, although he cites to no cases applying these provisions to a situation such as this, Mr. Shockley argues that subdivisions (1) and (2) apply. He argues that this Court should assume from the nature of the novel that Juror 58 talked about his novel to the other jurors and that this means they received "evidence, papers or documents, not authorized by the court" in violation of section 547.020.1. He then argues that this Court should hold as a matter of law that this information must have influenced their verdict and so must have "prevented fair and due consideration of the case" under section 547.020.2.

Alternatively, Mr. Shockley argues, the trial court erred in not granting his motion to inquire of Juror 58 during deliberations about the contents of his book and his beliefs, or at least that the trial court committed reversible error in not at some point *sua sponte* calling a hearing and "conducting its own inquiry into whether extraneous information or prejudicial material was made a part of the deliberative process." He argues that the lack of a hearing, at which possible improper influences could have been discovered, precludes meaningful appellate review.

Mr. Shockley's argument is without merit. There is nothing in the record to support Mr. Shockley's assumption that Juror 58 shared his novel and its story with the other jurors; the only evidence is that Juror 58 showed the book to a bailiff. While the nature of the novel's subject matter caused the court concern, the court determined that nothing in the record demonstrated that Juror 58 lied when he said he could be fair and impartial or that he was willing but reluctant to impose the death penalty. Mr. Shockley's argument to the contrary is premised on a degree of factual congruity between the novel and

the facts of the trial that does not exist.[12] Further, the defense's argument that Juror 58's assurance of his impartiality was false is premised on the assumption that Juror 58 shared the views expressed by the protagonist in his novel and tried to hide that fact from the court and counsel so that he could be seated on the jury. This is inconsistent with the fact that it was Juror 58 himself who brought his novel, and his son's police work, to the attention of the court and counsel so they could include these issues in their remaining line of questions.

It is of course possible to speculate that had a hearing been held, Juror 58 might have revealed that he shared his novel's themes or viewpoints with the other jurors or that he lied in *voir dire* or that he was unable to be neutral and impartial. But it is also possible to speculate that he would have reaffirmed what he said in *voir dire*—that he had a son who was a police officer and that he was a published author, but that he could be fair and impartial. What is certain is that there is no merit to the defense's argument that the trial court bore any degree of responsibility for the lack of a factual record. After trial, the judge sent counsel a letter in which he said in relevant part:

> I want to determine whether the state or the defendant will be requesting (or subpoenaing) any juror in this case to testify about any issue raised at trial or in pending motions.... Also, for your information, regarding the "book" referred to at trial, I have been advised that the same juror gave a copy of his book during the week of trial to the court bailiff.

Not only did neither counsel take the judge up on this offered opportunity to question Juror 58 about whether he had discussed his novel with other jurors, defense counsel specifically waived any right to such a hearing. He stated on the record at the motion for new trial hearing:

> we received [a] letter from the Court about whether or not we were going to call any jurors or anything like that. I just wanted to—...—supplement the record. We responded to the Court's letter that we did not intend to call any additional witnesses, whether it was Juror 58 or anyone else.

The issue, therefore, does not arise whether the trial court *sua sponte* should have set a hearing at which it could question jurors about the influence of Juror 58, for the court did hold a hearing on the motion for new trial and offered to allow jurors to be questioned or subpoenaed for that hearing. Not only did defense counsel not accept this opportunity, he affirmatively declined to call any witnesses. Mr. Shockley cannot now claim that the trial court committed plain error in failing to hold such a hearing and itself subpoena jurors as witnesses over defense counsel's statement that he did not want such witnesses. "It is axiomatic that a defendant may not take advantage of self-invited error or error of his own making." *State v. Mayes*, 63 S.W.3d 615, 632 n. 6 (Mo. banc 2001). While plain error review is discretionary, an appellate court should not use it to impose a *sua sponte* duty upon a trial court to correct mistakes of a defendant's own making. *See State v. Bolden*, 371 S.W.3d 802, 806 (Mo. banc 2012).

---

12. Here, unlike in the novel, the alleged perpetrator of a hit and run accident did not avoid punishment or receive only probation. Mr. Shockley was arrested for and was being tried for the premeditated murder of a police investigator. The issue for the jury was not whether to punish him for the hit and run accident but whether to find him guilty and impose a sentence of life imprisonment without parole or a death sentence.

No basis for reversal is shown in regard to Juror 58.

### E. The Death Sentence is not Disproportionate to the Penalty Imposed in Similar Cases

Whenever the death penalty is imposed, section 565.035.3, requires this Court to conduct a proportionality review and determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and
>
> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

*Id.*

■■■ Mr. Shockley does not claim under section 565.035.3(1) that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and this Court's independent review finds no reason to believe the verdict was based on any such factor.

Neither does Mr. Shockley claim under section 565.035.3(2) that the evidence does not support the jury's finding beyond a reasonable doubt of at least one statutory aggravating circumstance, and this Court determines after an independent review that the evidence supported the jury's finding of at least one statutory aggravator beyond a reasonable doubt. *See State v. Clay*, 975 S.W.2d 121, 145 (Mo. banc 1998)("The jury need find only one statutory aggravating circumstance in order to recommend imposition of the death penalty").[13]

Mr. Shockley argues, however, that this Court should find under section 565.035.3(3) that "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the strength of the evidence" because it is based solely on circumstantial evidence which, he claims, is of limited strength. In reviewing penalties imposed in similar cases, this Court must consider "all factually similar cases in which the death penalty was submitted to the jury, including those resulting in a sentence of life imprisonment without the possibility of probation or parole." *State v. McFadden*, 391 S.W.3d 408, 428 (Mo. banc 2013).

In support of his argument, Mr. Shockley cites *State v. Chaney*, 967 S.W.2d 47 (Mo. banc 1998), in which this Court found a death sentence disproportionate to the strength of evidence that was very weak and circumstantial. In so doing, *Chaney* did not state that a death sentence cannot be based on circumstantial evidence.

---

13. The three statutory aggravators the jury found supported by the evidence were that: (1) the defendant killed a peace officer because of the exercise of his official duty; (2) the victim was murdered for the purpose of preventing a lawful arrest of the defendant, and (3) the victim was a potential witness in the pending investigation of defendant for leaving the scene of a motor vehicle accident and was killed as a result of his status as a potential witness.

It is uncontested that as a highway patrolman, Sergeant Graham was a peace officer. The State presented substantial evidence that Sergeant Graham was investigating Mr. Shockley's involvement in another crime at the time of the murder, that Mr. Shockley was concerned that the investigation would lead to his arrest, and that Sergeant Graham had uncovered evidence of Mr. Shockley's involvement in the fatal truck accident involving Mr. Bayless and was a potential witness in that action.

Rather, it based its holding on the weakness of the particular facts, stating:

> In this case there is no eyewitness, confession, admission, document, fingerprint or blood evidence directly pointing to the defendant. Neither is there evidence of defendant's involvement in any similar or related crimes from which one might infer his involvement here. While sufficient to allow a reasonable juror to find guilt beyond a reasonable doubt, the evidence here is not as strong as evidence in similar cases imposing the death penalty noted above. After comparing the evidence in this and similar death penalty cases, we conclude that this case falls within a narrow band where the evidence is sufficient to support a conviction, but not of the compelling nature usually found in cases where the sentence is death.

*Chaney*, 967 S.W.2d at 60. This Court has upheld the death sentence in cases hinging upon circumstantial evidence where the circumstantial evidence was strong. *State v. Jones*, 749 S.W.2d 356 (Mo. banc 1988); *see also State v. Hutchison*, 957 S.W.2d 757 (Mo. banc 1997).

Here, the circumstantial evidence was strong. Knowing that Sergeant Graham was investigating his involvement in the accident that killed Mr. Bayless, for several months Mr. Shockley concocted a series of lies to conceal the fact that it was he who drove the truck into the ditch. He also encouraged others to lie for him about his participation in the accident, including putting his finger over his grandmother's mouth when she said she would not lie for him. Once Mr. Shockley learned that Sergeant Graham had verified his involvement, he obtained Sergeant Graham's home address. The day of Sergeant Graham's murder, Mr. Shockley borrowed his grandmother's car, and witnesses testified to seeing the car near Sergeant Graham's house during the estimated time of the murder. Mr. Shockley returned the car to his grandmother within thirty minutes of the shooting. The bullet that penetrated Sergeant Graham's Kevlar vest belonged to the .22 to .24 caliber class of ammunition. Although never found in his possession, Mr. Shockley was known to own a .243 rifle, and investigators discovered a single empty slot in Mr. Shockley's gun cabinet. On the night of the murder, Mrs. Shockley took a box of .243 ammunition to Mr. Shockley's uncle and stated that "Lance said you'd know what to do with them." After learning that Mr. Shockley previously had fired his .243 rifle on his uncle's property, investigators searched the grounds and discovered a .243 shell casing. The investigators also recovered several .243 shell casings on Mr. Shockley's field as well as several bullet fragments. Three highway patrol ballistics experts compared the fragments found on Mr. Shockley's property to the slug pulled from Sergeant Graham's body. All concluded that, in their expert scientific opinion, the three bullet fragments recovered from Mr. Shockley's field were fired from the same firearm as the one used to shoot the bullet into Sergeant Graham. In addition to the .243 rifle, Mr. Shockley owned numerous other guns, including three shotguns. A ballistics expert testified that a shotgun wadding discovered on Mr. Shockley's property was consistent with the wadding found near Sergeant Graham's body. The evidence was sufficient to support the imposition of a death sentence considering the strength of the evidence.

Mr. Shockley nonetheless argues that the fact the conviction is based on circumstantial evidence combined with the fact that the jury could not agree on punishment requires a finding of lack of proportionality. If accepted, this argument would mean that no circumstantial evidence case could be sent to the judge to

decide where the jury deadlocked on punishment. That would negate the legislature's intent that the trial court be permitted to determine whether to impose a death sentence where the jury finds the facts necessary to impose the death penalty but is unable to agree on punishment. Mr. Shockley cites no authority that Missouri's statutory procedure violates the state or federal constitutions, and this Court has upheld a death sentence where the trial court imposed the death sentence after the jury deadlocked on punishment. *State v. McLaughlin,* 265 S.W.3d 257 (Mo. banc 2008).

This Court's independent review also shows that the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This Court has upheld death sentences when a police officer was killed. *See State v. Johnson,* 284 S.W.3d 561 (Mo. banc 2009); *State v. Tisius,* 92 S.W.3d 751 (Mo. banc 2002); *State v. Clayton,* 995 S.W.2d 468 (Mo. banc 1999); *State v. Johnson,* 968 S.W.2d 123 (Mo. banc 1998). This Court also has upheld death sentences when the murder was committed for the purpose of preventing lawful arrest. *See State v. Smith,* 944 S.W.2d 901 (Mo. banc 1997); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988). Finally, this Court has upheld death sentences when the victim was a potential witness in a pending investigation. *See State v. Parker,* 886 S.W.2d 908 (Mo. banc 1994); *State v. Boliek,* 706 S.W.2d 847 (Mo. banc 1986).

Mr. Shockley argues that there are factually similar cases in which a life sentence was imposed rather than a sentence of death, but fails to cite to any such cases. This Court is unaware of a case in which a sentence of life imprisonment was imposed where the evidence showed that the defendant deliberately killed a peace officer due to the fear that the officer would arrest him after the officer discovered evidence in the exercise of his official duties that implicated the defendant in a prior crime and in order to prevent the officer from being a witness against him. Considering the penalty imposed in other cases, the death sentence is not disproportionate to the crime, the evidence or the defendant.

## IV. CONCLUSION

For the reasons set forth above, this Court finds no reversible error and concludes that the sentence imposed is not disproportionate to the crime, the strength of the evidence or the defendant. The judgment of the trial court is affirmed.

All concur.