4. Prejudice
"Generally, prejudice must be 'actual prejudice apparent on the record or by reasonable inference-not speculative or possible prejudice.' " Garcia , 316 S.W.3d at 912 (quoting State v. Edwards , 750 S.W.2d 438, 442 (Mo. banc 1988) ). "More recently, however, the United States Supreme Court allowed a speedy trial claim to stand absent particularized prejudice." Id. (citing Doggett v. United States , 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ). "Negligence, the Supreme Court said, is not 'automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.' " Id. (quoting Doggett , 505 U.S. at 657, 112 S.Ct. 2686 ).
*18 "There are three considerations in determining whether a delay has prejudiced the defendant: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired." Garcia , 316 S.W.3d at 912. "Courts regard the third consideration as the most serious." Id.
"[T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown."
Id. (quoting Barker , 407 U.S. at 532, 92 S.Ct. 2182 ).
Here, neither of the first two concerns are present, as much of Vickers's time in custody was due to either a parole violation on an unrelated case or his federal charge and conviction. State v. Williams , 120 S.W.3d 294, 300 (Mo. App. W.D. 2003) ("Williams was already incarcerated on an unrelated incident at the time of the possession charge, so oppressiveness of pretrial incarceration is not an issue."); United States v. MacDonald , 456 U.S. 1, 9, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982) ("Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life[, but t]his is true whether or not charges have been filed...."). As for the third concern, Vickers has not identified any real prejudice from the delay. There is certainly no negligence on the part of the State to bring him to trial, as was present in Doggett .[11]
At best, he argues that the State would not have found Keith Jones but for the delay. But he does not identify any witnesses experiencing memory issues, nor any evidence lost as a result of the delay. And most of Jones's testimony was cumulative of other evidence presented. Jones testified that he knew Vickers, Briggs, Ransom, Forbush, and Ewing. Jones testified that he gave money to Vickers to bond him out of jail and that they discussed Ewing's murder. According to Jones, Vickers said he drove the car and "[e]verybody knew why" they went to Ewing's house that night-it was "[t]o see if the money [belonging to Briggs] was there," and, in the course of doing so, "[a] man got killed." The only information Jones's testimony added to the evidence already presented by Forbush was that Jones bonded Vickers out of jail and that the assailants had apparently been looking for money. Everything else was cumulative to Forbush's testimony that Vickers and Briggs (both of whom she knew) and a third man arrived at her house, held her at gunpoint while searching for something, and one of them shot and killed Ewing. Accordingly, this factor weighs against Vickers.
After examining the four Barker factors, it is apparent that, although there was an extended delay, much of it was attributable to joint efforts by the State and Vickers to both investigate this matter and resolve his federal case. Vickers did not assert his right to a speedy trial *19 until one week before the trial was scheduled, and, at that time, he sought only dismissal of the charges and continued to seek additional delay. Finally, he has failed to demonstrate prejudice resulting from the numerous delays in which he acquiesced. Accordingly, he has failed to prove a violation of his right to speedy trial.
Point I is denied.
Exclusion of Alibi Witness
A. Background Facts
On the first day of trial, in the midst of voir dire examinations, Vickers advised the court that he wished to endorse a new witness and rely on an alibi defense:
We are requesting at this time to be permitted to endorse Emily DeMarea and announce that we have an alibi defense in this case. We would be able to proceed with her today if the State would like to talk with her. In the alternative, we would not object to a continuance for the State to investigate this alibi.
According to Vickers's counsel, DeMarea came to her attention approximately two weeks earlier, DeMarea was interviewed at that time, and DeMarea indicated that she remembered that she was with Vickers around the time of the charged crimes, but she was unsure of the exact dates. DeMarea then spoke with an investigator for the Public Defender's Office the morning of the first day of trial, "with regard to her memory of the events and believe[d] that she was with Mr. Vickers on the evening of this incident, which is August 15, leading into the morning of August 16, 2011." The State objected, noting that, at no point during the five years leading up to trial, had Vickers ever given any indication of an alibi defense. In fact, Vickers's counsel acknowledged that, one week earlier, in response to a discovery request from the State, Vickers had expressly denied any intent to rely on an alibi defense, despite his awareness of DeMarea as a potential alibi witness at that time. The court denied Vickers's request for late endorsement and assertion of an alibi defense:
I'm going to deny the motion. I just think there is nothing that I have heard that indicates any basis for the Court to allow this to come out when this is something that was apparently developing, at least a couple of weeks ago in some form it was developed. To not get notice of the alibi or give notice of the alibi until or really the afternoon of the first day of trial, I think is just fundamentally unfair to the State.
The court further noted,
It is incomprehensible to me how it can get to this point and the history of this case and be talking about an alibi witness being disclosed on the first day of trial, almost five years after this case was filed. I think it just crosses the line into just not justifying the late endorsement.
B. Standard of Review
"Discovery rules help eliminate surprise and allow both sides to become aware of trial witnesses and evidence." State v. Anderson , 348 S.W.3d 840, 846 (Mo. App. W.D. 2011). "Rule 25.05(A)(2) requires a defendant in discovery to disclose any witnesses he intends to call to testify." Id. "Rule [25.18] offers sanctions for failure to comply with discovery rules, and exclusion of a witness is one such sanction." Id. at 847. "The decision to exclude a witness under the rule is within the discretion of the circuit court." Id. "In determining whether the trial court abused its discretion, an appellate court must first consider what prejudice the State would have suffered as a result of the discovery violation and second, whether the remedy *20 resulted in fundamental unfairness to the defendant." Id. (quoting State v. Martin , 103 S.W.3d 255, 260 (Mo. App. W.D. 2003) ). "Exclusion may be proper when there is no reasonable justification for failure to disclose the witness." Id.
C. The court did not err in excluding Vickers's alibi witness.
"The remedy of disallowing an alibi witness to the defendant is almost as drastic, if not as drastic, as declaring a mistrial." State v. Mansfield , 637 S.W.2d 699, 703 (Mo. banc 1982). "The remedy of disallowing the relevant and material testimony of a defense witness essentially deprives the defendant of his right to call witnesses in his defense." Id. "This is not to say it should never be done, but it is certainly a drastic remedy that should be used with the utmost of caution." Id. "As a matter of law, no abuse of discretion exists when the court refuses to allow the late endorsement of a defense witness whose testimony would have been cumulative [or] collateral, or if the late endorsement would have unfairly surprised the State." State v. Hopper , 315 S.W.3d 361, 367 (Mo. App. S.D. 2010) (quoting State v. Destefano , 211 S.W.3d 173, 181 (Mo. App. S.D. 2007) ). "Therefore, the review of the propriety of the trial court's action includes consideration of whether the State was unfairly surprised by [the alibi witness's] testimony and the harm, if any, it would have suffered by virtue of that surprise." Id. at 368 (quoting State v. Simonton , 49 S.W.3d 766, 781 (Mo. App. W.D. 2001) ).
Here, the State sought, in a discovery request dated September 9, 2011, information as to whether Vickers intended to rely on an alibi defense. On May 9, 2016, one week before trial, Vickers responded to the discovery request by stating, "The defendant does not intend to rely on the defense of alibi at this time. Should this change, a supplemental response to discovery will be filed." It was not until the first day of trial, in the midst of voir dire , that Vickers first gave any indication of a possible alibi defense, despite the fact that he had been aware of and actively investigating DeMarea for at least two weeks. Additionally, DeMarea's potential alibi evidence would have been known to Vickers, as she claimed to be with him the night of the charged crimes. But, when Vickers first revealed DeMarea's presence to the State, his case had been pending for approximately fifty-six months, and he had raised a claimed violation of his right to a speedy trial. And, even if the court had agreed to grant a continuance, there is no way of knowing how long it would have taken the State to investigate DeMarea's testimony and, thus, how much further delay would have been caused by permitting the late endorsement. Accordingly, his offer of a continuance to allow the State to investigate DeMarea put the State in the awkward position of either proceeding in the face of an uninvestigated defense or further delaying Vickers's trial and thereby supporting his claimed speedy-trial violation. In short, Vickers's request to endorse DeMarea clearly took the State by surprise and would have resulted in fundamental unfairness to the State. Exclusion of proposed alibi witnesses is proper where "[n]o reasonable justification [i]s given for late endorsement." State v. Harris , 664 S.W.2d 677, 680 (Mo. App. E.D. 1984). Here, Vickers provided no reasonable justification for the late endorsement, and, as in Harris , "It is inconceivable that [the] alibi witness[ ] w[as] undiscovered the [nearly five] years prior to the [first] day of the trial." Id. at 680-81.
Point II is denied.
Sufficiency of the Evidence
In his third point on appeal, Vickers argues that the evidence was insufficient *21 to support the jury's determination that he deliberated upon Ewing's death, as was required to support his conviction for first-degree murder. We disagree.
A. Standard of Review
"To determine whether the evidence presented was sufficient to support a conviction and to withstand a motion for judgment of acquittal, [a reviewing c]ourt does not weigh the evidence but, rather, 'accept[s] as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignore[s] all contrary evidence and inferences.' " State v. Zetina-Torres , 482 S.W.3d 801, 806 (Mo. banc 2016) (quoting State v. Holmes , 399 S.W.3d 809, 812 (Mo. banc 2013) ). Our "review is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." Id. (quoting State v. Letica , 356 S.W.3d 157, 166 (Mo. banc 2011) ). "This is not an assessment of whether [we] believe[ ] that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting State v. Nash , 339 S.W.3d 500, 509 (Mo. banc 2011) (internal quotations omitted)).
B. The evidence was sufficient to establish that Vickers deliberated on Ewing's death.
In this case, Vickers was charged as an accomplice to first-degree murder for Ewing's death. "To convict a defendant of first[-]degree murder on a theory of accomplice liability, the state must prove that the accomplice deliberated upon the murder; the element of deliberation cannot be imputed." State v. Rousan , 961 S.W.2d 831, 841 (Mo. banc 1998). "Deliberation means cool reflection upon the victim's death for some amount of time, no matter how short." Id. "A submissible case of accomplice liability for first[-]degree murder exists where there is some evidence that the accomplice made a decision to kill the victim prior to the murder from which the jury could infer that the accomplice coolly deliberated on the victim's death." Id.
"For accomplice liability, circumstances that can support an inference of deliberation must be those properly attributable to the accomplice." Id. The Missouri Supreme Court
has outlined three circumstances highly relevant to determining whether accomplice liability may be inferred for first[-]degree murder: first, the defendant or a co-defendant in the defendant's presence made a statement or exhibited conduct indicating an intent to kill prior to the murder; second, the defendant knew that a deadly weapon was to be used in the commission of a crime and that weapon was later used to kill the victim; and third, the defendant participated in the killing or continued with a criminal enterprise after it was apparent that a victim was to be killed.
Id.
Here, the evidence supported a determination that Vickers deliberated on Ewing's death in multiple ways. First, Vickers brought a gun with him to Ewing's home. "A reasonable inference can be drawn that by bringing a deadly weapon to commit the crime ... planned, [the defendant] reasonably anticipated use of the weapon." State v. Stacy , 913 S.W.2d 384, 387 (Mo. App. W.D. 1996). Second, when Vickers and the third individual were unable to find whatever they were seeking, Briggs said, "Just do it," after which both Forbush and Ewing were shot, suggesting that the plan had been to kill any witnesses *22 upon completion of the search. This inference is further supported by the fact that none of the men made any effort to hide their identity from the victims who both knew at least two of the men (including Vickers), suggesting that the men did not intend for the victims to survive, so there was no risk of being identified. This kind of planning supports a finding of deliberation. State v. Collings , 450 S.W.3d 741, 760 (Mo. banc 2014) (evidence demonstrating "planning on Collings'[s] part to facilitate the crime [was] evidence of deliberation"). Third, Ewing was shot seven times, and there was apparently a brief pause in the middle of those shots. "Deliberation may be inferred from multiple wounds," especially when there is a break between injury-causing incidents. Stacy , 913 S.W.2d at 386. Finally, Briggs, Vickers, and the third man all fled the scene without procuring any aid for either Forbush or Ewing, both of whom had suffered serious gunshot wounds. The "inference of deliberation is strengthened by the fact that [the defendant] left the crime scene without procuring aid for the victim," despite knowing the victim had been seriously injured. Id. at 387. Accordingly, there was sufficient evidence from which the jury could determine that Vickers deliberated upon Ewing's death.
Point III is denied.
Newly Discovered Evidence
A. Background Facts
On May 2, 2016, a detective who served as a State's witness at Vickers's trial ("Detective") was involved in an altercation, unrelated to Vickers's case, that resulted in an official criminal investigation and an internal police department inquiry. Detective was identified as the victim of an assault by a man who believed Detective was having an affair with the man's wife. Detective initially denied the man's accusations, but the following day, he admitted to his superiors that he had, in fact, been having an affair with the woman. That same day, the prosecutor's office declined to file charges against Detective's assailant.
From May 2, 2016, through July 18, 2016, Detective's superiors conducted an internal investigation into Detective's conduct surrounding the assault. Vickers's trial began on May 16, 2016, and Detective testified on May 17, 2016. The following day, May 18, 2016, Detective was first notified by his superiors of the internal investigation in a formal disciplinary report, wherein it was alleged that Detective violated Personnel Policy 201-8 Code of Ethics and Rules of Conduct, Section IV-Rules of Conduct, Subsection B, Line 8, which provided that "Members will not ... [e]ngage in or attempt to engage in, or knowingly consent to any form of dishonesty, including deviations from the truth, whether on or off duty."
Vickers's trial concluded on May 20, 2016, and he was given twenty-five days in which to file a motion for new trial. Vickers filed a motion for new trial twenty-one days later, on June 10, 2016. On July 15, 2016, Vickers's counsel sought a continuance of the originally scheduled sentencing hearing, based upon "a letter received by the PD's office on another case in regard to Detective ..., with regard to that he is pending investigation with regard to his truthfulness." Despite its determination that any further motions for new trial would be untimely, the trial court, in an abundance of caution, granted Vickers a continuance to further investigate the information.
The existence of the investigation into Detective was formally disclosed to Vickers on August 10, 2016. Vickers then filed a second motion for new trial on August 23, 2016, alleging that the investigation *23 into Detective's conduct constituted newly discovered Brady[12] evidence warranting a new trial. As of August 24, 2016, Detective had not been subjected to any disciplinary action, and the internal inquiry was still pending review and final determination.
At the hearing on Vickers's second motion for new trial, the trial court expressed its concern "as to whether a witness, a police officer or otherwise, who has been determined to have been dishonest in some other matter can be impeached by bringing up an unrelated matter where there was some specific instance of dishonesty." Thereafter, the court denied Vickers's motion, finding that Detective's testimony was neither adverse to Vickers nor his theory or defense and, therefore, the newly discovered evidence was not material. The court stated its belief that
the strength of the State's case herein would always rise or fall exclusively on whether the jury was convinced beyond a reasonable doubt of the credibility of the eyewitness identification of Defendant by the surviving victim, Krist[e]n Forbush. The testimony of Detective ... had no material impact on the identification issue.
The court further determined that "extrinsic evidence concerning the unresolved disciplinary proceeding against Detective would not be properly admissible as impeachment evidence under Mitchell v. Kardesch , 313 S.W.3d 667 (Mo. banc 2010)." The court finally concluded that, "even if the newly discovered evidence regarding the pending disciplinary proceedings against Detective ... at the KCPD at issue were deemed proper impeachment evidence, there is no reasonable probability that the result of the trial would have been any different."
B. Standard of Review
"Rule 29.11(b) provides that, in a criminal case, a motion for new trial must be filed not later than fifteen days after the verdict is returned, and for good cause shown, the court may extend the time for filing by one additional period not to exceed ten days." State v. Shelton , 529 S.W.3d 853, 866 (Mo. App. E.D. 2017). "Rule 29.11(b) applies to requests for new trials based upon newly discovered evidence." Id. "The time limitations in Rule 29.11(b) for filing a motion for new trial in criminal cases are mandatory." Id.
"Rule 29.11(b) 'does not make an exception extending the time to file a motion, even where the newly discovered evidence on which the motion for a new trial is predicated is not discovered until after the filing deadline has passed.' " Id. (quoting State v. Stephens , 88 S.W.3d 876, 880 (Mo. App. W.D. 2002) ). "Because no exception is provided, a request to add a ground to the motion for new trial is a nullity when it is made after the extension period has expired." Id. (internal quotations omitted). "In other words, a motion for new trial may not be filed or amended to allege, 'as a basis for a new trial, the existence of newly discovered evidence which was not discoverable until after the filing deadline had passed.' " Id. (quoting Stephens , 88 S.W.3d at 880 ). "Accordingly, an untimely motion for new trial is not an appropriate means to introduce new evidence, preserves nothing for appeal, and is a procedural nullity." Id. at 866-67. "Nevertheless, an appellate court may review the untimely claim to determine whether 'extraordinary circumstances' exist that *24 justify remand and establish that manifest injustice or miscarriage of justice occurred." Id. at 867.
Generally, alleged Brady violations arising after the time in which a motion for new trial must be filed are "more appropriately addressed in the context of a habeas corpus motion in which the prosecution's serious alleged violation of Brady ... can be explored." Weeks v. State , 140 S.W.3d 39, 42 n.2 (Mo. banc 2004). Nevertheless, "Missouri's appellate courts have considered Brady claims raised [through other avenues] but only when the appellate court had a proper record to consider or where the facts were uncontroverted." State v. Parker , 198 S.W.3d 178, 181 (Mo. App. W.D. 2006). Here, the trial court held a hearing on the untimely motion for new trial. Thus, regardless of the propriety of its choice to do so, the fact that it did means that we have a sufficient record before us to review Vickers's claim.
C. The newly discovered evidence did not warrant a new trial.
Vickers argues that evidence pertaining to the internal inquiry of Detective constituted Brady evidence that the State had an independent duty to disclose insofar as he could have used it to challenge Detective's credibility as a witness. In Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court clarified that "[i]mpeachment evidence, ... as well as exculpatory evidence, falls within the Brady rule." "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " Kyles v. Whitley , 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting Bagley , 473 U.S. at 682, 105 S.Ct. 3375 ). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434, 115 S.Ct. 1555. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " Id. (quoting Bagley , 473 U.S. at 678, 105 S.Ct. 3375 ).
"[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 436-37, 115 S.Ct. 1555. Simply "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more." Id. at 437, 115 S.Ct. 1555. The undisclosed evidence must be material to the case before any relief is warranted. Materiality is a question of "whether we can be confident that the jury's verdict would have been the same," had the State disclosed the favorable evidence.[13] Id. at 453, 115 S.Ct. 1555.
*25 Both parties agree that the evidence at issue here is, at best, impeachment evidence.[14] In other words, "[t]he constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination." Bagley , 473 U.S. at 678, 105 S.Ct. 3375. But "such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." Id. In other words, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Id.
Vickers argues that "there was no forensic or other physical evidence of any kind linking him to the shootings[;] ... the State's case against Mr. Vickers was based solely on eyewitness identification testimony of Kristen Forbush." This is what the trial court found as well, when it noted that "the strength of the State's case herein would always rise or fall exclusively on whether the jury was convinced beyond a reasonable doubt of the credibility of the eyewitness identification of Defendant by the surviving victim, Krist[e]n Forbush." But where Vickers and the trial court disagree is what effect, if any, Detective's testimony had on Forbush's credibility. Vickers argues that "Det[ective's] ... testimony was presented to bolster the credibility of Kristen Forbush's identification." Whereas the trial court determined that "[t]he testimony of Detective had no material impact on the identification issue." We agree with the trial court.
Detective testified that his involvement with Forbush was limited to taking her statement:
Q. Did you also then take a statement from Kristen Forbush?
A. I did.
Q. What day was it that you took that statement?
A. I believe it was the 18th, two days later.
Q. Okay. Two days later?
A. Yes.
Q. Was it a videotaped statement?
*26 A. Yes.
Q. Was it taken at the police station?
A. Yes.
Q. And it actually was transcribed as well. Meaning that there was a transcription of that videotaped statement?
A. Yes.
Q. And in that statement did she identify two individuals that were involved in the homicide, in the shooting of Edward Ewing, and the shooting of herself?
A. She did.
Q. And you went over the details of that statement with her?
A. Yes, I did.
Q. And in full?
A. In full.
Q. Okay. And did she waiver [sic] on who was involved in this case?
A. Not in the least.
Q. Who did she say was involved in that shooting?
A. Garron Briggs and Victor Vickers.
Vickers suggests that, because "[t]he State specifically asked [Detective] whether Forbush waivered [sic] at all in her identification two days after the shooting, and Det[ective] ... replied, 'not in the least,' " his testimony was "critically important" to the jury's determination of Forbush's credibility. We disagree. Forbush knew Vickers and Briggs from high school and recognized them immediately on the night of the charged crimes. She consistently repeated this identification to multiple officers and not just Detective. And, to the extent his testimony established that her identification was consistent, it was merely cumulative of the other evidence demonstrating her consistent identification of her assailants.[15] Detective was not the officer that showed Forbush any photographic lineups from which she identified Vickers, and Detective's function in relation to her was merely to record her statement for evidentiary purposes. Accordingly, the allegedly undisclosed impeachment evidence does not meet the Brady materiality standard.
Point IV is denied.
Other Crimes Evidence
In his final point, Vickers argues that the trial court abused its discretion in denying his request for a mistrial after one of the State's witnesses mentioned something about Vickers being "into drugs."
A. Background Facts
Before trial, Vickers filed a motion in limine seeking to preclude the State from making any "reference to any of his prior bad acts or uncharged crimes ..., including, but not limited to, the Defendant being a drug dealer and/or associated with drugs." The court granted the motion. During Sergeant Clinton Sanders's testimony, he stated that Forbush identified Vickers as one of her assailants. The State asked Sergeant Sanders, "Did she tell you how she knew it was [Vickers] that night?" Sergeant Sanders replied, "She said she knew him as a wanna-be rapper that was into drugs." Vickers objected on the ground that the testimony violated the court's ruling on the motion in limine and *27 requested an immediate mistrial. Vickers requested no other relief. The trial court denied the requested mistrial, finding that, "under all the circumstances in this case that have been developed so far," the reference was not "so prejudicial to the defendant that it would justify mis-trying the case."
B. Standard of Review
"We review the trial court's denial of a motion for mistrial for abuse of discretion." State v. Neighbors , 502 S.W.3d 745, 748 (Mo. App. W.D. 2016). "Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id. (quoting State v. Pope , 50 S.W.3d 916, 922 (Mo. App. W.D. 2001) ).
C. The trial court did not abuse its discretion in denying Vickers's request for a mistrial.
Vickers argues that the trial court erred in denying his motion for mistrial because Sergeant Sanders's testimony constituted impermissible evidence of uncharged crimes. "As a general rule, 'evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes.' " State v. Barriner , 34 S.W.3d 139, 144 (Mo. banc 2000) (quoting State v. Bernard , 849 S.W.2d 10, 13 (Mo. banc 1993) ). "When not properly related and logically relevant to the crime at issue, the introduction of other crimes evidence violates the defendant's right to be tried only for the offense for which he is charged." Id. (quoting State v. Clover , 924 S.W.2d 853, 855 (Mo. banc 1996) ).
"A mistrial is a drastic remedy that should be granted in only extraordinary circumstances." State v. Costa , 11 S.W.3d 670, 677 (Mo. App. W.D. 1999). "The trial court is in the best position to determine whether the incident caused prejudice." Id.
In response to Vickers's objection, the prosecutor indicated, "I wasn't expecting him to say drugs.... I merely wanted him to identify the fact that she knew who [Vickers] was. That is what I was trying to get to." Accordingly, we are faced with an uninvited reference to other crimes.
"Missouri courts have generally examined five factors in determining the prejudicial effect of an uninvited reference to other crimes." State v. Goff , 129 S.W.3d 857, 866 (Mo. banc 2004).
These five factors are: 1) Whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; 4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the volunteered statement; and 5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt.
Id. at 866 n.7.
An analysis of these five factors demonstrates that the trial court did not abuse its discretion in denying Vickers's motion for a mistrial. First, the prosecutor's question was not designed to elicit any information about Vickers being involved in drugs. The prosecutor asked how Forbush knew Vickers, not what she knew of him. Forbush knew Vickers because *28 they attended high school together-that was the information the question sought. Second, after Sergeant Sanders's answer and Vickers's objection, the prosecutor advised, "We can leave that alone. I won't bring it up anymore." And there is nothing else in the record to suggest that the prosecutor did otherwise. Third, the remark itself was somewhat vague. It mentioned that Vickers was "into drugs," but did not specify what that meant. It did not indicate that he had been charged or convicted of any drug offenses, nor did it state that he used or sold drugs. But, even accepting that it would be reasonable to infer illegal activity from the reference, Vickers still cannot prevail on this claim. As to the fourth factor, though the trial court did not sustain the objection and instruct the jury to disregard, the reason it did not do so is because Vickers declined the court's offer of any other form of relief besides a mistrial. "The fact that a defendant limits his request for relief to that of a mistrial rather than making a request for a less drastic corrective action cannot aid him." State v. Wright , 383 S.W.3d 1, 11 (Mo. App. W.D. 2012) (quoting State v. Porter , 241 S.W.3d 385, 399-400 (Mo. App. W.D. 2007) ). And, as to the final factor, there is no reason to believe that this single, isolated reference, which amounted to nothing more than Forbush's reported impression of Vickers, played a decisive role in the jury's verdict. The entire case hinged on Forbush's identification of her assailants, two of whom she knew from high school. The jury apparently accepted her identification and, therefore, found Vickers guilty.
In short, because the reference was brief, isolated, and unlikely to have affected the verdict, Vickers has not demonstrated that the trial court abused its discretion in denying his request for a mistrial.
Point V is denied.
Conclusion
Vickers has failed to demonstrate any reversible error made by the trial court. Accordingly, his convictions and sentences are affirmed.
Alok Ahuja and Edward R. Ardini, Jr., Judges, concur.

The negligence at issue in Doggett was the government's failure to arrest the defendant for a period of eight and one-half years after securing an indictment, despite the facts that, during that period, the defendant had "married, earned a college degree, found a steady job as a computer operations manager, [and] lived openly under his own name." Doggett v. United States , 505 U.S. 647, 649, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). There is nothing similar in Vickers's case.

Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

Vickers has raised his claim as one of newly discovered evidence. Typically, to succeed on a claim of newly discovered evidence, Vickers would have to show:
1) the evidence has come to the knowledge of the party since the trial; 2) failure to discover the evidence sooner was not the result of a lack of due diligence; 3) the evidence is so material that a new trial would produce a different outcome ; and 4) it is not cumulative only or merely impeaching the credibility of a witness.
Hancock v. Shook , 100 S.W.3d 786, 798 (Mo. banc 2003) (emphasis added). But, "the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial." United States v. Agurs , 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." Id. Accordingly, the Brady "reasonable probability" standard of materiality is the applicable standard, rather than the outcome-determinative standard applied to claims of newly discovered evidence.
An added layer of complexity exists in this case because the motion for new trial at issue was untimely, rendering it a procedural nullity. In such cases, however, appellate courts will consider granting relief if the alleged error constituted "extraordinary circumstances" that resulted in either a manifest injustice or a miscarriage of justice. State v. Shelton , 529 S.W.3d 853, 867 (Mo. App. E.D. 2017). Here, because Vickers fails to meet the less rigorous Brady standard of materiality, he necessarily fails to meet the more demanding standard of "extraordinary circumstances" resulting in manifest injustice.

"[T]here are exceptional circumstances in which impeachment is reason to remand to the trial court to grant a new trial at the appellate court's discretion." State v. Terry , 304 S.W.3d 105, 110 (Mo. banc 2010). Such "exceptional circumstances," however, are not present under the facts before us.

Vickers's entire misidentification defense hung on Forbush's single prior inconsistent statement to the 911 operator when she called for help. When Forbush called 911, the operator asked who shot her and she replied, "I don't fucking know." The operator asked her a second time, and she responded, "I think so." During her testimony, Forbush explained that she was frustrated by the question initially because she was trying to get medical help for herself and Ewing and did not see how identity of the shooters mattered at that point. Vickers was able to elicit this information and question Forbush about her identification through cross-examination.