

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD82404** |
| **v.** | ) | |
| | ) | |
| | ) | **OPINION FILED:** |
| | ) | **March 24, 2020** |
| **SHAYNE LANCE GARRETSON,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Moniteau County, Missouri**
**The Honorable Matthew P. Hamner, Judge**

**Before Division One:** Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Anthony Rex Gabbert, Judges

Mr. Shayne Garretson ("Garretson") appeals from the judgment entered by the Circuit Court of Moniteau County, Missouri ("trial court"), following a jury trial in which he was found guilty of one count of statutory rape, four counts of statutory sodomy, and five counts of incest. Garretson seeks plain error review of unpreserved evidentiary and opening statement claims of error on appeal. We affirm.

## Facts and Procedural History[1]

Garretson (whose relationship to the victims was as a grandfather) was married to "Grandmother." They had a home in Sedalia, Pettis County, Missouri, as well as a lake house in Morgan County, Missouri. Garretson and Grandmother had three adult biological children, "Mother," "Uncle 1," and "Uncle 2." Mother had two biological daughters of her own, J.C. and K.M.[2]

Garretson sexually abused J.C. and K.M. at his home in Sedalia and at the lake house during the summers of 2014 and 2015.

J.C. testified that the first time Garretson did something inappropriate was at the house in Sedalia when she was nine years old. While clothed, Garretson touched her breasts and put her legs on his penis. Another time at the Sedalia house, he put his finger in her vagina, telling her, "This is what it feels like to have a baby." J.C. screamed and started crying because it "hurt really bad."

On two occasions when only Garretson and J.C. were at the lake house, Garretson put his fingers in her vagina. The first time, after he was done, she bled from her vagina, vomited, and soiled herself. She felt "shocked," "traumatized," and "really scared." She used a sanitary napkin and wore Grandmother's underwear home. J.C. also bled the second time Garretson put his fingers in her vagina while at the lake house. She screamed and told him to stop. She asked him why he was doing this to her, and he replied, "God chose him."

---

[1] On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Ryland*, 533 S.W.3d 745, 746 n.2 (Mo. App. W.D. 2017) (citing *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009)).

[2] Pursuant to section 595.226.1 of the REVISED STATUTES OF MISSOURI 2016, we have used initials to identify the victims and family members so as to protect their identity. We have also used pseudonyms to refer to the victims' mother, grandmother, and uncles—again, to protect the identity of the victims.

Garretson would tell J.C. that he was taking her skating, shopping, or out to eat, but either instead of or after those activities, he would take her to the lake house. The sexual assaults at the lake house occurred in Garretson and Grandmother's bedroom. He licked J.C.'s vagina at the lake house multiple times. He would rub his penis on or inside her vagina. Sometimes he would put a lubricant in her vagina. Garretson told J.C. not to tell anyone because "bad things would happen or something else."

K.M.'s first sexual encounter with Garretson was in the bedroom of the Sedalia house when she was eight years old. She woke up and Garretson was licking and putting his finger in her vagina. She screamed and yelled for help. Uncle 1 came to the bedroom door and knocked. Garretson went to the door and cracked it a little bit so he could see Uncle 1. Uncle 1 asked what was going on, and Garretson told him that the television was turned up. Another time at Garretson's house in Sedalia, K.M. saw J.C. go into Garretson's bedroom with him. The door was locked, and K.M. sat outside on the stairs, listening in case she heard screams. When J.C. came out of the bedroom, K.M. asked her if Garretson had been "doing anything" to her. J.C. asked why, and K.M. told her that Garretson had been molesting her. J.C. told K.M. that Garretson had been molesting her too.

Garretson also sexually assaulted K.M. at the lake house. Multiple times, Garretson licked K.M.'s vagina. He also put his fingers in her vagina multiple times, and a couple of times he rubbed his penis on her vagina. Another time Garretson attached handcuffs to K.M.'s ankles and the bed frame to restrain her so she could not close her legs. Once when J.C. and K.M. were together at the lake house alone with Garretson, J.C. and K.M. took shifts sleeping and staying up during the night "so that he wouldn't come and get one of us." On one occasion when Garretson was driving J.C. and K.M. to the lake house after skating, they cried and told him to take them

3

home.  When asked why, K.M. yelled, "Because you're going to rape us!"  Garretson told K.M. not to tell anyone because "[y]our mom will get hurt."

On September 25, 2015, Garretson was planning to visit Uncle 1 in Colorado.  He wanted to take eleven-year-old J.C. and nine-year-old K.M. with him.  Mother called J.C. and K.M.'s schools to arrange for Garretson to pick them up.  When J.C. received a note from the school office that she was going to be a car rider instead of a bus rider and that her grandfather was going to pick her up, J.C. went to the counselor's office and called Mother.  She told Mother that she wanted to ride the bus home and did not want to go to Colorado with Garretson.

When J.C. arrived home from school, Mother asked her why she and K.M. all of a sudden did not want anything to do with Garretson.  J.C. told Mother, "every time we go with Papa he tries to rape us."  J.C. further explained that Garretson had been raping her and K.M.  Mother immediately called her mother, Grandmother, and asked her to intercept Garretson, who had picked up K.M. at school.  When Garretson and K.M. arrived at Mother's house, Grandmother was waiting for them, and she immediately took K.M. to meet Mother and J.C.  J.C. told K.M. that she had told Mother what had happened with Garretson.  K.M. then also confirmed to Mother that Garretson had touched her "private."

Mother reported J.C. and K.M.'s disclosures to law enforcement.  On September 30, 2015, J.C. and K.M. were interviewed at Child Safe of Central Missouri in Sedalia.  J.C. was emotional as she related multiple incidents of Garretson sexually assaulting her.  K.M. also spoke to the interviewer about Garretson's abuse.

On October 6, 2015, Garretson's case file was referred by Pettis County to the Morgan County Sheriff's Department.  On October 14, 2015, Garretson was present when a search warrant for the lake house was executed.  Garretson's truck was searched, and in the toolbox officers found

4

a bag with children's underwear and a swimsuit top inside. J.C.'s DNA was on the underwear. In the search of the truck cab, officers found handcuffs, a handgun, and condoms. In the search of the lake house, officers found a black backpack with another set of handcuffs, Vaseline, a plastic tube, condoms, and nine firearms. Garretson was arrested on October 15, 2015.

Garretson posted bond and called Mother the next day to ask her to meet him. They went to a cemetery where he threatened to commit suicide. He told her, "I did not have sex with [J.C.]." But when Mother asked him how J.C. ended up bleeding, he stated that he "pushed his finger in too hard." When Garretson returned home from the cemetery, Garretson's brother-in-law, R.B., was there. Garretson told R.B. that "there's a demon in me."

On October 21, 2015, a child abuse and neglect pediatrician conducted sexual assault forensic examinations ("SAFE") of J.C. and K.M. at Children's Mercy Hospital in Kansas City. Her diagnosis for both girls was sexual abuse.

Garretson was charged with the following offenses: (1) one count of statutory rape in the first degree for knowingly having sexual intercourse with J.C., a child less than twelve years old; (2) one count of the class D felony of incest for engaging in sexual intercourse with J.C., knowing she was his descendant by blood; (3) one count of statutory sodomy in the first degree for having deviate sexual intercourse with J.C., who was then less than twelve years old, by placing his finger in her vagina; (4) one count of the class D felony of incest for engaging in deviate sexual intercourse by placing his finger in her vagina, knowing she was his descendant by blood; (5) one count of statutory sodomy in the first degree for having deviate sexual intercourse with J.C., who was then less than twelve years old, by licking her vagina with his tongue; (6) one count of the class D felony of incest for engaging in deviate sexual intercourse by licking J.C.'s vagina, knowing she was his descendant by blood; (7) one count of the felony of statutory sodomy in the

first degree for having deviate sexual intercourse with K.M., who was then less than twelve years old, by licking her vagina with his tongue; (8) one count of the class D felony of incest for engaging in deviate sexual intercourse by licking K.M.'s vagina, knowing she was his descendant by blood; (9) one count of the felony of statutory sodomy in the first degree, by having deviate sexual intercourse with K.M., who was then less than twelve years old, by placing his finger in her vagina; and (10) one count of the class D felony of incest for engaging in deviate sexual intercourse by placing his finger in K.M.'s vagina, knowing her to be his descendant by blood.

A jury trial was held September 11-13, 2018. Garretson testified in his own defense, denying all allegations against him. The jury found Garretson guilty of all ten counts. The trial court sentenced Garretson to thirty years' imprisonment on the statutory rape charge and on each of the statutory sodomy charges and to four years' imprisonment on each of the incest charges, with all sentences to run concurrently.

Garretson timely appealed.

## I.

In Garretson's first point on appeal, he asserts that the trial court erred in overruling his request for an acquittal at the close of the State's opening statement.

### Standard of Review

At trial, Garretson made a limited argument regarding the substance of the State's opening statement as it related to some, but not all, of the counts with which Garretson had been charged. On appeal, Garretson changed his argument and broadened the scope of his objection to the State's opening statement by changing his theory of objection and making arguments relating to all, not some, of the charges against him. "[A] point is preserved for appellate review only if it is based on the same theory presented at trial." *State v. Rice*, 573 S.W.3d 53, 63 (Mo. banc 2019) (internal

6

quotation marks omitted). "An appellant cannot broaden the scope of his objections on appeal beyond that made in the trial court." *Id*. (internal quotation marks omitted). "[Garretson] attempts to do just that; thus, this claim is not preserved and is subject to review for plain error only." *State v. Simmons*, 515 S.W.3d 769, 776 (Mo. App. W.D. 2017).

Under Rule 30.20, this court is authorized to review, in its discretion, "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review involves a two-step process:

> The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*State v. Baumruk*, 280 S.W.3d 600, 607-08 (Mo. banc 2009) (citations omitted) (internal quotation marks omitted).

## Analysis

"The State is required to make an opening statement in a criminal case." *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000) (citing § 546.070(1)). *Accord* Rule 27.02(f).[3] "As a general rule the opening statement should be brief and general, rather than detailed, and should be confined to statements based on facts which can be proved . . . ." *State v. Feger*, 340 S.W.2d 716, 724 (Mo. 1960) (internal quotation marks omitted). "'[T]he primary purpose of an opening statement is to inform the judge and jury of the general nature of the case, so they may appreciate the significance of the evidence as it is presented.'" *State v. Pennington*, 493 S.W.3d 926, 930 (Mo. App. W.D. 2016) (quoting *State v. Thompson*, 68 S.W.3d 393, 394 (Mo. banc 2002)).

---

[3] All rule references are to I MISSOURI COURT RULES—STATE 2019.

"An opening statement is sufficient when, taken with the reasonable inferences drawn therefrom, the defendant is apprised of the charges against him." *Johns*, 34 S.W.3d at 110 (internal quotation marks omitted). A trial court should enter a judgment of acquittal in a criminal prosecution on the opening statement of the prosecutor "*only* when it clearly and affirmatively appears from the statement that the charge against the accused cannot be sustained under any view of the evidence and *only* when the opportunity to correct or embellish the statement has been given to the prosecutor subsequent to the accused's motion for a [judgment of acquittal]."[4] *Id.*

In his opening statement, the prosecutor stated that Garretson "molested and sexually assaulted two of his granddaughters, [J.C.], who was 11 years old at the time, and [K.M.], who was 9 years old at the time." The prosecutor recounted what J.C. told her mother as to why she did not want to go on the Colorado trip with Garretson: because Garretson "rapes" them. The prosecutor stated that J.C. would testify "about the multiple sexual assaults that she endured at the hands of her grandfather, . . . specifically you'll hear about an incident in Morgan County where Shayne Garretson inserted his fingers into her vagina hard enough to make her bleed." The prosecutor told the jury that they would hear from K.M. "how her grandfather licked her vagina and also put his fingers in her vagina." The prosecutor concluded his opening statement by requesting that, when the trial ended, the jury find Garretson guilty of all ten counts: "Find Shayne

---

[4] Motions for judgment of acquittal are used in the place of a motion for directed verdict. Rule 27.07(a). We also note that after the State's opening statement and Garretson's motion for judgment of acquittal, the prosecutor offered to "correct or embellish" the opening statement to the extent the trial court believed the opening statement failed to apprise Garretson of the charges against him and Garretson *objected* to allowing the prosecution to do so. The trial court refused to permit the prosecutor to "correct or embellish" the opening statement, but also concluded that it was unnecessary to do so. Though we agree with the trial court that the State's opening statement sufficiently apprised Garretson of the crimes he was charged with, we also note that Garretson's position on appeal ignores the holding of *State v. Johns*, which would permit a judgment of acquittal of the defendant "*only* when the opportunity to correct or embellish the [opening] statement has been given to the prosecutor" upon the assertion of the motion for judgment of acquittal. 34 S.W.3d 93, 110 (Mo. banc 2000). Here, at defendant's request, the prosecutor was not provided such opportunity to "correct or embellish" the opening statement even though the prosecutor had requested an opportunity to do so.

8

Garretson guilty of statutory rape, statutory sodomy[,] and the incest that he took out on these two girls."

Here, the State's opening statement, taken with the reasonable inferences drawn therefrom, was sufficient to apprise Garretson of the charges against him. Garretson was informed of the evidence J.C. and K.M. and other witnesses would be giving at trial, the physical evidence supporting the allegations, and the location of the alleged offenses.

Garretson's claim of error does not facially establish substantial grounds for believing that manifest injustice or miscarriage of justice resulted from the opening statement of the State; therefore, we decline to review for plain error.

Point I is denied.

## II.

In Garretson's second point, he asserts that the trial court erred in not *sua sponte* declaring a mistrial when the State played a recording that contained prior bad acts, specifically that Garretson tried to make J.C. and K.M. smoke and drink alcohol.

### Standard of Review

Garretson concedes that he did not preserve this issue below and, therefore, requests plain error review.

### Analysis

Prior to trial, Garretson filed a motion *in limine* to preclude the State from offering evidence of Garretson's prior bad acts. The trial court ruled that "the only acts of [Garretson] that should be discussed by the witnesses at trial are those allegations charged in this case and those allegations related to the offenses in Pettis County for which we have had the propensity hearing on."

9

On the first day of trial, during *defense* counsel's cross-examination of K.M., he questioned K.M. about whether she talked to her mother about her grandfather's sexual abuse on the day of the initial disclosures:

Q:     Okay. Even on September 25th you didn't talk to you mom about it?

A:     Huh-uh. My grandma when she picked me up, she asked about it, and I had told her very little. All I told her was that he had made me and my sister drink and smoke. And then she asked what else, and they said all of it was a finger, with my finger (indicating).

Though K.M.'s volunteered testimony was arguably not responsive to defense counsel's question, defense counsel did not object to K.M.'s response, ask that it be stricken from the record, nor request that the jury be instructed to disregard it. Yet, it is this *same* evidence (*i.e.*, smoking and drinking testimony) that was played to the jury in a video recording of the forensic interviews of J.C. and K.M. that Garretson claims required the trial court, *sua sponte*, to declare a mistrial.

On the second day of trial, State's Exhibit 8, a video recording of the forensic interviews of J.C. and K.M., was admitted into evidence and played for the jury. During J.C.'s interview, she related that Garretson had tried to get her to drink liquor and smoke but she refused. Defense counsel requested that the trial court stop the video and allow counsel to approach the bench. The following exchange occurred:

Defense counsel:     I guess I don't know what the remedy is.

Prosecutor:     Well, [J.C.] testified exactly to that yesterday, and so I'll cut out the remainder and not draw any attention to this, but it's—there isn't one. You didn't find it earlier. And that's exactly what she said yesterday in direct.

Defense counsel:     Just because someone said it before doesn't make it admissible now.

Trial court:     But you didn't object to it.

Defense counsel:     What?

10

| | |
|---|---|
| Trial court: | You didn't object to it. |
| Defense counsel: | I did. |
| Trial court: | No, you didn't. I asked specifically for the [prior bad act] references, and you told me which ones they were. I asked if there were any others and you said no. |
| Defense counsel: | Well, that was one of them. |
| Prosecutor: | No, it wasn't. |
| Trial court: | No, it was not. |

"A mistrial is a drastic remedy that should be granted in only extraordinary circumstances." *State v. Vickers*, 560 S.W.3d 3, 27 (Mo. App. W.D. 2018) (internal quotation marks omitted). "The trial court is in the best position to determine whether the incident caused prejudice." *Id.* (internal quotation marks omitted). In determining the prejudicial effect of an uninvited reference to other crimes, Missouri courts generally examine five factors:

(1) [w]hether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; (2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; (3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; (4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the volunteered statement; and (5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt.

*Id.* (quoting *State v. Goff*, 129 S.W.3d 857, 866 n.7 (Mo. banc 2004)).

In reviewing these five factors, it is clear that the trial court did not err, plainly or otherwise, in not declaring a mistrial *sua sponte*. First, J.C. voluntarily shared the smoking and drinking information in response to an open-ended question by the forensic interviewer. Second, the reference was brief and isolated, and there is nothing in the record to suggest that the prosecutor emphasized the statement. Third, the remark indicated that J.C. did not succumb to her

11

grandfather's proffer.  As to the fourth factor, defense counsel did not request a mistrial.  And, as to the final factor, there is no reason to believe that this isolated reference played a decisive role in the jury's verdict.  Rather, it was the overwhelming evidence of Garretson's sexual abuse as testified to by the two victims and as corroborated by physical evidence.  Moreover, Garretson was not prejudiced because the evidence was cumulative of the same evidence elicited by defense counsel during his cross-examination of K.M. earlier in the trial.  And, as previously noted, this cross-examination testimony of K.M. came into evidence without objection.

Point II is denied.

## III.

In Garretson's third point, he asserts that the trial court erred in overruling his request for a mistrial after the prosecutor mentioned "propensity hearing" during his cross-examination of Garretson.

### Standard of Review

"To properly preserve an issue for an appeal, a timely objection must be made during trial." *State v. Tolentino-Geronimo*, 571 S.W.3d 214, 216 (Mo. App. W.D. 2019) (internal quotation marks omitted).  "The objection at trial must be specific and made contemporaneously with the purported error."  *Id.* (internal quotation marks omitted).  Here, Garretson failed to make a contemporaneous objection to the prosecutor's mention of a propensity hearing during Garretson's cross-examination.

Typically, an objection made after a question has been asked and answered is untimely. *State v. Rice*, 573 S.W.3d 53, 73 (Mo. banc 2019).  Here, when the prosecutor's question mentioned "propensity hearing," the grounds for any potential objection from Garretson were evident, but he failed to object at that time.  Rather, Garretson's objection was not made until much

12

later in the State's continued line of questioning. Because Garretson's objection was untimely, the issue was not preserved for appeal. *Id*. "'When a defendant fails to make an objection contemporaneous with the purported error, on appellate review, the issue is evaluated for plain error, which requires a showing that the error resulted in manifest injustice or a miscarriage of justice.'" *State v. Nelson*, 505 S.W.3d 437, 442 (Mo. App. W.D. 2016) (quoting *State v. Shockley*, 410 S.W.3d 179, 189 n.4 (Mo. banc 2013)).

**Analysis**

During cross-examination, the prosecutor asked Garretson:

> Mr. Garretson, you want this jury to believe that all these people that have testified here these last few days, that [J.C.] and [K.M.] when they went to that child advocacy center and told what you'd done and then went to a deposition and then went to—[K.M.] went through a preliminary hearing and then [K.M.] testified in a propensity hearing here two weeks ago, so did [J.C.], and then they testified here today or the last few days, they're lying every time that they've come here and said that to a court after being under oath?

Garretson answered: "They have been schooled by their mother. The stories were all invented." The prosecutor asked seven more questions, which Garretson answered, before defense counsel asked to approach the bench. Defense counsel requested that the trial court declare a mistrial "based upon the State's mention of a propensity hearing because of the prejudicial nature of that term." The trial court observed that the evidence related to the propensity hearing was already in front of the jury, and asked the prosecutor not to refer to the propensity hearing further. The trial court denied Garretson's motion for mistrial.

"'[P]ropensity evidence is evidence of uncharged crimes, wrongs, or acts used to establish that [a] defendant has a natural tendency to commit the crime charged.'" *State v. Boss*, 577 S.W.3d 509, 519 (Mo. App. W.D. 2019) (quoting *State v. Shockley*, 410 S.W.3d 179, 193 (Mo. banc 2013)) (internal quotation marks omitted). "'[Propensity evidence] is evidence of specific and distinct

prior acts.'" *Id.* (quoting *Shockley*, 410 S.W.3d at 193). "The law permits the State to try a defendant only for the offense for which he is on trial[,] and [t]his precludes the State from unjustifiably introducing evidence of a defendant's prior, uncharged crimes or bad acts." *State v. Lutes*, 557 S.W.3d 384, 390 (Mo. App. W.D. 2018) (internal quotation marks omitted).[5]

A passing reference to a "propensity hearing" is at best a vague reference to misconduct. "Vague references are not clear evidence of associating a defendant with other crimes." *Boss*, 577 S.W.3d at 520 (internal quotation marks omitted). "Vague and indefinite references to misconduct do not warrant a mistrial unless the reference is clear evidence of the defendant's involvement in another crime." *State v. Jensen*, 524 S.W.3d 33, 41 (Mo. banc 2017).

A passing reference to a "propensity hearing" in a question to a witness is also not evidence of prior bad acts. The jury was instructed that they "must not assume as true any fact solely because it is included in or suggested by a question asked a witness. A question is not evidence, and may be considered only as it supplies meaning to the answer." Furthermore, Garretson's answer did not address the State's mention of a propensity hearing.

Garretson argues that the State's reference to a propensity hearing "inject[ed] a presumption of uncharged crimes" into the trial. However, virtually the identical argument was

---

[5] We note that article I, section 18(c) of the Missouri Constitution provides:

> [I]n prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

"[I]n the context of sex crimes involving minors, the provision unequivocally supersedes the Supreme Court of Missouri's evidentiary rulings that once prohibited propensity evidence." *State v. Lutes*, 557 S.W.3d 384, 390 (Mo. App. W.D. 2018) (internal quotation marks omitted). "Article I, section 18(c) applies to all trials on or after December 4, 2014, irrespective of when the crimes are alleged to have occurred." *Id.* at 390 n.4 (citing *State ex rel. Tipler v. Gardner*, 506 S.W.3d 922, 928 (Mo. banc 2017)). Thus, even if the prosecutor's mention of "propensity hearing" could be considered propensity evidence, which it cannot, the evidence in question was legally relevant propensity evidence and would have thus been admissible under article I, section 18(c) as referenced above.

14

rejected in *State v. Simmons*, 654 S.W.2d 190 (Mo. App. E.D. 1983). In *Simmons*, the appellant contended that the trial court erred in denying his motion for mistrial when the prosecutor questioned the victim about the victim's identifying the defendant at the preliminary hearing. *Id.* at 191. Appellant argued that the testimony impermissibly suggested to the jury that there had been a prior judicial determination of his guilt. *Id.* The *Simmons* court found that appellant's contention that he was prejudiced by the State's reference to the preliminary hearing was frivolous and concluded that it "[did] not believe that the mere mention of a preliminary hearing suggested to the jury that there had been a prior judicial determination of defendant's guilt." *Id.* Similarly, here, we do not believe that the prosecutor's mere mention of a propensity hearing suggested to the jury that there was evidence of prior bad acts.

Garretson's claim of error does not facially establish substantial grounds for believing that manifest injustice or miscarriage of justice has resulted from the prosecutor's mere mention of a propensity hearing during Garretson's cross-examination; therefore, we decline to review for plain error.

Point III is denied.

## IV.

In Garretson's fourth point, he asserts evidentiary error in the admission of hearsay testimony regarding a comment that Garretson had made to his brother-in-law that "there's a demon in me."

### Standard of Review

Garretson concedes that he did not preserve this issue in his motion for new trial, and therefore, requests plain error review.

15

**Analysis**

At trial, the following colloquy occurred in the prosecutor's direct examination of Garretson's brother-in-law, R.B.:

> Q:     [R.B.] . . . [w]ould you please testify with regards to your memory as to the substance of the conversation that you had with Mr. Garretson?
>
> A:     Yes.  He had told me that he couldn't go to jail, that he had a bad back.  And I implored him to ask God for forgiveness, and then he had said to me, there's a demon in me.
>
> Q:     There's a demon in him?
>
> A:     Uh-huh.

"'A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends upon the veracity of the statement for its value.'" *State v. Clark*, 503 S.W.3d 235, 238 (Mo. App. W.D. 2016) (quoting *State v. Tisius*, 362 S.W.3d 398, 405 (Mo. banc 2012)).  "A hearsay statement is inadmissible unless it falls under a recognized hearsay exception." *Id*.  "'Generally, statements of the defendant are excepted from the hearsay rule.'" *State v. Evans*, 992 S.W.2d 275, 290 (Mo. App. S.D. 1999) (quoting *State v. Basile*, 942 S.W.2d 342, 358 (Mo. banc 1997)).  *See also State v. Voss*, 488 S.W.3d 97, 115 (Mo. App. E.D. 2016) ("[T]he admission of a criminal defendant is not considered to be hearsay." (citing *State v. McFadden*, 369 S.W.3d 727, 753 (Mo. banc 2012)).  In *State v. Isa*, the defendant contended that her comments to a police officer at the crime scene were inadmissible hearsay.  850 S.W.2d 876, 894 (Mo. banc 1993).  The Missouri Supreme Court disagreed, concluding that the statements were non-hearsay admissions:

> An admission is the statement . . . of a party that tends to incriminate or connect her with the crime charged, or which manifests a consciousness of guilt.  In determining whether a defendant's statement constitutes an admission, the court must consider the defendant's statement in light of the surrounding circumstances. . . .  Moreover,

16

a statement need not express an acknowledgment of guilt to qualify as an admission.

*Id*. *See State v. Clark*, 503 S.W.3d 235, 239-40 (Mo. App. W.D. 2016) (same).

Garretson made the statement, "there's a demon in me," after he bonded out of jail and met with his daughter at a cemetery where he threatened to commit suicide and told her that J.C. bled because he pushed his finger in too hard. When Garretson returned home from the cemetery, his brother-in-law, who was aware of the allegations that had been made against Garretson, was there. R.B. described the circumstances of his conversation with Garretson: "Well, the family was together[,] and we were concerned about him. You know, he was threatening to kill himself. He was distraught. And, you know, we were together to support my sister basically." Garretson told R.B. that he could not go back to jail because he had a bad back. In response, R.B. implored Garretson to ask God for forgiveness. That is when Garretson told R.B. that "there's a demon in me." Under the circumstances, Garretson's claim that "there's a demon in me," by which he deflected blame to appear less culpable, was a non-hearsay admission that manifested a consciousness of guilt. *See State v. Fitzgerald*, 778 S.W.2d 689, 691 (Mo. App. E.D. 1989) ("Appellant's statements that demons caused the cuts on [her eleven-month-old daughter's] wrist and that she was present when [her daughter] suffered the injuries were admissions. Untrue denials can constitute admissions as well as manifesting a consciousness of guilt. A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein." (citations omitted)). *See also State v. Matthews*, 552 S.W.3d 674, 689-90 (Mo. App. W.D. 2018) (finding defendant's explanations of victim's injuries that directed attention away from defendant's responsibility was evidence of consciousness of guilt).

Point IV is denied.

**Conclusion**

Because none of Garretson's claims facially establish substantial grounds that manifest injustice or miscarriage of justice has resulted, we decline to exercise our discretion to review the claimed errors under Rule 30.20.  The trial court's judgment is affirmed.

/s/ *Mark D. Pfeiffer*

Mark D. Pfeiffer, Judge

Thomas N. Chapman, Presiding Judge, and Anthony Rex Gabbert, Judge, concur.